[S. F. No. 20617.   In Bank.   Feb. 19, 1962.]

KERR'S CATERING SERVICE, Plaintiff and Respondent,
v. THE DEPARTMENT OF INDUSTRIAL RELA-
TIONS et al., Defendants and Appellants.

Stanley Mosk, Attorney General, and Preble Stolz, Deputy Attorney General, for Defendants and Appellants.

Leon E. Gold, Pauline Nightingale, Samuel S. Berman, Harold G. Stearn and Charles P. Scully as Amici Curiae on behalf of Defendants and Appellants.

Spruance, Simonian & Pretzer and Arthur L. Pretzer for Plaintiff and Respondent.

Brobeck, Phleger & Harrison and Alvin L. Rockwell as Amici Curiae on behalf of Plaintiff and Respondent.

WHITE, J.—Defendants appeal from a summary judgment in favor of plaintiff Kerr Catering Service holding a certain order of defendant Industrial Welfare Commission unconstitutional and void.

Plaintiff is in the industrial catering business. It maintains a fleet of trucks which are sent out on regular routes to various business and industrial establishments. Each truck is driven by a woman employee who also sells sandwiches, coffee and other food items which are carried on the truck. Plaintiff's employees are organized into a union and pursuant to a collective bargaining agreement, they receive a wage which equals or exceeds the minimum specified in the applicable order of the Industrial Welfare Commission. After completing a probationary period of three months, the driver-salesgirls receive a 15 per cent commission on all sales in excess of $475 a week.

This percentage commission, payable monthly, is subject to reduction in the amount of any "cash shortage" attributable to the salesgirl during the month. The shortages are computed in the following manner: The driver-salesgirl is required to inventory the goods on her truck prior to going out each day, receives a small amount of cash to make change, and upon returning at the end of the working day she counts the cash and again takes an inventory of the goods. In theory, the total of the closing inventory plus cash sales should equal the initial morning inventory, but in practice this seldom occurs. The extent of the difference is the amount of overage or shortage for that day. The net shortage for the month is deducted from the employee's commission, but not from her base wage in the event the net shortage exceeds her commissions.

Plaintiff was notified by the Division of Industrial Welfare that this deduction for cash shortages was unlawful under section 8 of Order No. 5-57 of the Industrial Welfare Commission (8 Cal. Admin. Code, § 11380), which provides: "No employer shall make any deduction from the wage of an employee for any cash shortage, breakage, or loss of equipment, notwithstanding any contract or arrangement to the contrary, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or wilful act, or by the culpable negligence of the employee."

Following receipt of the aforesaid notice, plaintiff instituted this action for an injunction and declaratory relief, alleging that section 8 of the foregoing order was in excess of

the statutory authority of the commission and unconstitutional. The Industrial Welfare Commission of the Department of Industrial Relations filed an answer and moved for summary judgment. Plaintiff filed a cross-motion for summary judgment. The trial court, acting on such motions, rendered judgment in favor of plaintiff.

Under the statutory definition found in Labor Code section 200, " 'Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, *commission basis*, or other method of calculation." (Emphasis added.) Plaintiff does not urge, therefore, that section 8 of the instant order is inapplicable because the deductions are made from commissions as opposed to basic pay.

The parties agree that if statutory authority for section 8 of the commission's order exists, it is to be found in Labor Code section 1182 which grants to the Industrial Welfare Commission the power to issue orders which "fix:

"(a) A minimum wage to be paid to women and minors engaged in any occupation, trade, or industry in the State, which shall not be less than a wage adequate to supply the necessary costs of proper living to, and maintain the health and welfare of such women and minors.

"(b) The maximum hours of work consistent with the health and welfare of women and minors engaged in any occupation, trade, or industry in this State. The hours so fixed shall not be more than the maximum now or hereafter fixed by law.

"(c) The standard conditions of labor demanded by the health and welfare of the women and minors, engaged in any occupation, trade, or industry in this State. . . ."

The narrow question presented, then, is whether the commission has power to prohibit deductions for cash shortages from employees' commission even though the affected employees are earning more than the minimum wage. The question is composed of two parts: (1) Do subdivisions (a) and (b) of section 1182 of the Labor Code limit the commission's power to fix, under subdivision (c), only those "standard conditions of labor" which do not affect either the wage or hours? (2) If the commission's power under subdivision (c) is not so limited, can such deductions for cash shortages not due to the employee's dishonest or wilful act or culpable negligence be characterized as standard conditions of labor?

Plaintiff construes this statute as giving the commission three separate and distinct powers which are mutually exclusive. Thus, according to this view, after fixing the minimum wage, the commission had no power to make any further provision whatsoever affecting the wage. Accordingly, since the plaintiff's employees were admittedly receiving more than the minimum wage, the commission had no power to prohibit deductions which did not reduce the net wage below the minimum. That, by similar reasoning, the commission's power over the hours of work is limited to fixing the maximum hours, and anything further relating to hours would be beyond the power of the commission. This construction would confine subdivision (c) to empowering the commission to regulate nothing which incidentally affects minimum wages or maximum hours.

Defendants, to the contrary, urge that subdivision (c) of section 1182 gives the commission general power to fix "[t]he standard conditions of labor," except insofar as this general grant of power is expressly limited by subdivisions (a) and (b). That while wages and hours are certainly "conditions of labor," the commission cannot fix *the* wage paid or *the* hours worked because subdivisions (a) and (b) limit the commission's power in those respects to fixing the *minimum* wage and the *maximum* hours. The commission is free, defendants continue, to make regulations which relate to wages and hours but which do not attempt to prescribe them.

One such provision, first introduced into the commission's orders in 1947, and not challenged since, requires that employers pay for all necessary protective garments. This provision has never been limited to employees receiving the minimum wage. Although the protection of the health and safety of women and minors is the obvious purpose of this provision, it also affects wages, as the employer may not deduct the cost of protective garments from the employee's compensation. Under plaintiff's construction of section 1182, and the one adopted by the trial court, this provision concerning protective garments would come under question because of its effect on wages. Other provisions of the order now engaging our attention, namely Order No. 5-57, which regulates only the Public Housekeeping Industry, which would also be subject to question under this construction are the prohibition on deductions for uniforms, for tools and equipment, the require-

ment of time and one-half the regular rate of pay for overtime, one dollar per day extra for split shift workers, and two dollars for reporting for work if work is not available. All of these provisions have in common the fact that they "affect the wage," but apply regardless of whether or not the employee is making the minimum wage, and are for the purpose of prohibiting or discouraging working conditions prejudicial to the welfare of women and minor employees.

Defendants state that the commission has long exercised such general powers which have not heretofore been challenged in any court action. That its position has been sustained by the Attorney General, who in 1944 advised the commission that it had the power to prohibit employers from requiring women and minors to furnish their own equipment and uniforms regardless of whether the employees were earning more than the minimum wage (3 Ops. Cal. Atty. Gen. 353), and this interpretation was reaffirmed recently with regard to sections 8 and 9 of this series of orders (33 Ops. Cal. Atty. Gen. 27 (1959)). Defendants earnestly urge that such a longstanding and established administrative construction of their powers should be accorded considerable weight, and adhered to "if not clearly erroneous." (*Adoption of Parker,* 31 Cal.2d 608, 615 [191 P.2d 420] ; *County of Los Angeles* v. *Superior Court,* 17 Cal.2d 707, 712 [112 P.2d 10].) ▇▇▇ We are persuaded that the construction placed upon section 1182 of the Labor Code by defendants is the reasonable and proper one, *i.e.,* that the authority conferred upon the commission by subdivision (c) is not limited to the issuance of orders which do not affect wages or hours.

We turn now to the second part of the question: may deductions for cash shortages not due to an employee's dishonest or wilful act or culpable negligence be characterized as affecting "standard conditions of labor ?"

▇▇▇ Wages of workers in California have long been accorded a special status generally beyond the reach of claims by creditors including those of an employer. This public policy has been expressed in the numerous statutes regulating the payment, assignment, exemption and priority of wages.

Among these statutes we find section 690.11 of the Code of Civil Procedure which exempts wages from garnishment. ▇▇▇ It is doubtful that an employer with an unliquidated claim for damages against an employee would be permitted

to withhold wages due the employee where such wages could not be reached by the employer as a judgment creditor.

Furthermore, it is manifest that wages due belong to the employee, and not to the employer. Labor Code section 2860 provides: "Everything which an employee acquires by virtue of his employment, *except the compensation which is due to him from his employer,* belongs to the employer. . . ." (Emphasis added.)

The public's interest in workers' wages is also manifested by the provisions of section 300 of the Labor Code limiting the assignment of wages. The assignment by the employee of wages to be earned is declared void except as to necessities of life and then only in limited amounts. The statutory prohibition is made inapplicable to deductions for the "payment for goods or services furnished by the employer to the employee or his family at the request of the employee." This specific exclusion from the prohibition against assignment would seem to preclude deductions from wages for other claims such as damages for torts which the employer may have against the employee.

California courts have recognized the public policy in favor of full and prompt payment of wages due an employee. In 1918, the court in upholding the constitutionality of the penalty wage law stated: "Delay of payment or loss of wages results in deprivation of the necessities of life, suffering inability to meet just obligations to others, and, in many cases may make the wage-earner a charge upon the public." (*Moore* v. *Indian Spring etc. Mining Co.,* 37 Cal.App. 370, 379-380 [174 P. 378].)

More recently, this court in an opinion which held the misdemeanor penalty for the wilful failure to pay wages constitutional, observed that "It has long been recognized that wages are not ordinary debts, that they may be preferred over other claims, and that, because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due. [Citations.] An employer who knows that wages are due, has ability to pay them, and still refuses to pay them, acts against good morals and fair dealing, and necessarily intentionally does an act which prejudices the rights of his employee. Such conduct amounts to a 'case of fraud' within the meaning of the exception to the constitu-

tional prohibition and may be punished by statute." (*In re Trombley,* 31 Cal.2d 801, 809-810 [193 P.2d 734].)

Still another expression of this state's concern for the workers who form such a large part of our population is found in *People* v. *Vandersee,* 139 Cal.App.2d 388, 390-391 [294 P.2d 77], wherein the court said: "And legislation which is enacted with the object of promoting the welfare of large classes of workers whose personal services constitute their means of livelihood must certainly be regarded as of direct and vital concern to every community and as calculated to confer direct or indirect benefits upon the people as a whole, thereby coming within the proper exercise of the police power, seeking as it does to promote the welfare of a large class against a real and existing danger. . . .

" ' . . . The prospective employer and the applicant for employment, who is usually dependent on his own earnings for the support of himself and his family, do not deal on an equal footing.' "

In *Reid* v. *Overland Machined Products,* 55 Cal.2d 203 [10 Cal.Rptr. 819, 359 P.2d 251], this court held the Labor Code requirement that an employer unconditionally pay wages concededly due had the effect of rendering void an attempted accord and satisfaction as to a disputed balance yet outstanding. We stated at page 208 that: "Section 206 is designed to secure to the wage earner prompt payment of all wages concededly due and it expressly precludes an employer's coercing a settlement of disputed claims by offering conditional payment."

In the case at bar, the parties stipulated that the deductions from the wages of plaintiff's employees are taken for shortages "not caused by a dishonest or wilful act or by the culpable negligence of the employee." Deductions may be made, therefore, for losses beyond the employees' control, as well as for losses due to simple negligence. The employees, through this device, are in effect made insurers of the employer's merchandise, and the commissions earned by the employees which are subject to the deduction serve the same purpose as an employee's "bond" exacted by the employer to cover shortages.

Labor Code sections 400 through 410 set out in detail the employee's bond law, and the manner in which a cash bond may be exacted from an employee to cover merchan-

dise entrusted to him.[1] It provides a criminal penalty for the violation of its provisions. (Lab. Code, § 408.) These deductions from wages due appear to be in contravention of the spirit, if not the letter, of the Employee's Bond Law. ██ " 'Where a statute prohibits or attaches a penalty to the doing of an act, the act is void even though the statute does not expressly pronounce it so. . . ██ The imposition by statute of a penalty implies a prohibition of the act referred to and a contract founded upon such act is void.' [Citations.]'' (*Reid* v. *Overland Machined Products, supra,* 55 Cal.2d 203, 208.) ██ Manifestly, the Industrial Welfare Commission was intended to have authority under section 1182, subdivision (c) to prohibit a practice intended to accomplish the same purpose as one expressly proscribed by statute.

██ Furthermore, the clerical or accounting feature of the employment relation, of which this system of deductions is a part, is certainly a condition of employment which the commission has the right to regulate. The use of the device of deductions creates the danger that the employer, because of his superior position, may defraud or coerce the employee by deducting improper amounts. ██ While it is conceded in the case at bar that plaintiff herein practiced no fraud or deceit upon his employees, nevertheless, it was the utilization of secret deductions or "kick-backs" to make it appear that an employer paid the wage provided by a collective bargaining contract or by a statute, although in fact he paid less, that led to the enactment of Labor Code sections 221-223 in 1937. These sections, this court said in *Sublett* v. *Henry's etc. Lunch,* 21 Cal.2d 273, 274 [131 P.2d 369], "are declarative of an underlying policy in the law which is opposed to fraud and

---

[1]Labor Code § 402. No employer shall demand, exact or accept any cash bond from an employee or applicant unless:

(a) The employee or applicant is entrusted with property of an equivalent value, or

(b) The employer advances regularly to the employee goods, wares, or merchandise to be delivered or sold by the employee, and for which the employer is reimbursed by the employee at regular periodic intervals, and the employer limits the cash bond to an amount sufficient to cover the value of the goods, wares, or merchandise so advanced during the period prior to the payment therefor.

Labor Code § 403. If cash is received as a bond it shall be deposited in a savings account in a bank authorized to do business in this State, and may be withdrawn only upon the joint signatures of the employer and the employee or applicant.

Cash put up as a bond shall be accompanied by an agreement in writing made by the employer and employee or applicant, setting forth the conditions under which the bond is given.

deceit." In *Shalz* v. *Union School District*, 58 Cal.App.2d 599 [137 P.2d 762], the court held that deductions by the employer from stipulated wages for payment of exorbitant amounts for lodging and transportation were in reality nothing more than devices to reduce the wage scale.

A further reason for legislative disapproval of deductions exists in the reliance of the employee on receiving his expected wage, whether it be computed upon the basis of a set minimum, a piece rate, or a commission. To subject that compensation to unanticipated or undetermined deductions is to impose a special hardship on the employee.

Plaintiff contends, however, that the effect of section 8 of the instant order is unfair to the employer since the prohibition of deductions for cash shortages places the burden of these losses upon the employer. But some cash shortages, breakage and loss of equipment are inevitable in almost any business operation. It does not seem unjust to require the employer to bear such losses as expenses of management when it is presently the unchallenged practice to require him to bear, as a business expense, the cost of tools and equipment, protective garments and uniforms furnished to the employee by prohibiting in section 9, subdivisions (a), (b) and (c) of Order 5-57, deductions for these costs.

Furthermore, the employer may, and usually does, either pass these costs on to the consumer in the form of higher prices or lower his employees' wages proportionately, thus distributing the losses among a wide group. In addition, the employer is free to discharge any employee whose carelessness causes the losses, and he is not prohibited from deducting for cash shortages caused by the "dishonest or wilful act, or by the culpable negligence of the employee."

California is not alone in its position that cash shortages should be borne as an expense of management. Hawaii, Wisconsin, New York, Oregon, Pennsylvania, and Washington have similar statutes and orders.[2]

While it is fundamental in our law that an administrative agency may not, under the guise of its rule-making

---

[2]Rev. Laws of Hawaii, 1955 ch. 95-4, as amended by Act 137, L. 1957; Wis. Stats., ch. 103.455; McKinney's Consolidated Laws of New York, Book 30, Labor Law, § 656; Oregon Revised Statutes § 653.110, Wage and Hour Commission Order No. 14; Purdon's Pa. Statutes Annotated, title 43, § 331a, General Interpretative Bulletin No. 1 Applicable to All Minimum Wage Orders; Washington Revised Code, title 49, §§ 49.46.002 to 49.46.910, I.W.C. Order No. 46.

power, abridge or enlarge its authority or act beyond the powers given to it by the statute which is the source of its power, however, " 'the authority of an administrative board or officer . . . to adopt reasonable rules and regulations which are deemed necessary to the due and efficient exercise of the powers expressly granted cannot be questioned. This authority is implied from the power granted.' [Citations.]'' (*California Drive-in Restaurant Assn.* v. *Clark,* 22 Cal.2d 287, 303 [140 P.2d 657, 147 A.L.R. 1028].)

From the foregoing it is obvious that both the Legislature and our courts have accorded to wages special considerations other than merely fixing minimums, and that the purpose in doing so is based on the welfare of the wage earner. As demonstrated, the regulation in the instant case affected conditions of employment, and the commission might well fix such "standard conditions of labor demanded by the health and welfare of'' women and minors. We are aided in this conclusion by the presumption that regulations of the Welfare Commission are "reasonable and lawful'' (Lab. Code, § 1200), and the recent opinions of this court upholding the regulations of administrative agencies for which there is no express statutory or constitutional authority. (*Hough* v. *McCarthy,* 54 Cal.2d 273 [5 Cal.Rptr. 668, 353 P.2d 276]; *Sauer* v. *McCarthy,* 54 Cal.2d 295 [5 Cal.Rptr. 682, 353 P.2d 290]; *Allied Properties* v. *Department of Alcoholic Beverage Control,* 53 Cal.2d 141 [346 P.2d 737].)

We hold, therefore, that the Legislature did not intend that subdivisions (a), (b), and (c) of section 1182 be mutually exclusive in the instant application thereof, but that the commission is authorized to regulate a condition of labor affecting wages above the minimum, and that deductions for cash shortages is properly characterized as a condition of employment. It necessarily follows that the legislation now before us does no violence to constitutional due process or equal protection of the law.

For the foregoing reasons the judgment is reversed and the cause remanded with directions to the court below to enter judgment for defendants.

Gibson, C. J., Traynor, J., Peters, J., and Dooling, J., concurred.

SCHAUER, J.—I concur in the judgment and, in general, in much of the opinion authored by Mr. Justice White. As a

precaution, however, against the drawing of unwarranted inferences from the opinion I state more fully my reasons for concurrence.

The subject order of the Industrial Welfare Commission prohibits wage deductions for cash shortage "unless it can be shown that the shortage . . . is caused by a dishonest or wilful act, or by the culpable negligence of the employee." It prohibits, in other words, deductions for shortages either (1) caused by negligence of the employe other than "culpable negligence" (whatever that may mean), or (2) occurring without any negligence whatever on the part of the employe.

On the record before us it is unnecessary to explore the meaning in this context of the criminal law term "culpable negligence" (see, e.g., Pen. Code, § 26 (subd. Six); *People* v. *Sidwell* (1915) 29 Cal.App. 12, 18-19 [154 P. 290]), or to consider whether the commission has statutory authority to prohibit deductions caused by negligence of the employe other than "culpable negligence." After three days of hearings on plaintiff-employer's appeal from the initial determination of violation of Order No. 5-57, the Division of Industrial Welfare made findings of fact concerning plaintiff's method of operation which are here set out in the footnote.[1] From these findings the Division of Industrial Welfare concluded "that employees working under such conditions cannot be held to be guilty of *culpable* negligence, or any negligence. Indeed, the

---

[1] In addition to the facts summarized in the opinion of Justice White (*ante*, p. 319) the following findings were made:

"2. Inventory is supposed to be taken at the conclusion of the day's run and the additional items loaded in the morning added to this. Between the time of night inventory and morning additions, the driver is not in control of the truck. It is open, standing in the yard. Some of the items are buried in ice and not visible. Small items, such as candy, may be jumbled together.

"3. Each route driver is supposed to inventory her truck prior to starting on her route. Fifteen minutes is the time allotted to inventory, load and prepare the truck for the road.

"4. Every truck driver on each route has a definite time that she is to be at each establishment on her route.

"5. An analysis of the beginning and ending times for each route showed that some routes have as little as five or ten minutes to prepare trucks.

"6. Starting time for drivers is staggered, but the major portion of the drivers report to work between 7:00 and 7:15 a. m.

"7. Route drivers have full charge of their trucks while on the route. However, two sides are open simultaneously at each stop allowing ample opportunity for pilferage. At the completion of the work day employees are required to lock their trucks and turn the key in to the office. Trucks are loaded by other personnel following the completion of the day's run

greatest diligence could still result in an overage or a shortage. Discrepancies are bound to occur due to the *system*, rather than the individual.''

These administrative findings ''are, in the absence of fraud, conclusive'' (Lab. Code, § 1187), and are not challenged in the present proceeding. In the light of the history of past abuses reflected in the enactment of the various regulatory provisions of part 1, division II of the Labor Code (e.g., §§ 201, 209, 221, 222.5, and 401), the commission could properly conclude that deductions for shortages occurring without any fault on the part of the employes and hence unrelated to their performance are disruptive of good employer-employe relations and tend to impose a special hardship upon the individual employe, who normally relies on payment in full of his or her anticipated wages. To this extent the commission could properly determine that such deductions are detrimental to ''The standard conditions of labor demanded by the health and welfare of the women'' employed in plaintiff's business (Lab. Code, § 1182, subd. (c)), and accordingly issue the subject order of compliance.

Our decision, however (as I understand the intention of its author), should not be construed by the commission as authorizing it to regulate *any* term of an employment contract on the theory that a ''condition of labor'' is thereby affected.

No such all-encompassing delegation of power was intended by the Legislature in enacting section 1182 of the Labor Code. The commission does not have authority to fix ''conditions of labor'' *in general* any more than it has authority to fix minimum wages or maximum hours without regard to the statutory criteria (Lab. Code, § 1182, subds. (a) and (b)). By subdivision (c) of section 1182 the commission's authority in this respect is expressly restricted to fixing those ''standard'' conditions of labor which are ''demanded by the health and

and prior to the start of the next day's run. During the loading period, employees' trucks are open and accessible to others.

''8. Shortages may be caused by 'paper errors,' by failure to take inventory, or by pilferage on the part of the customers.

''9. Route drivers have no knowledge as to whether they are over or short at the time that their cash is turned in. A list of overages and shortages is normally posted the day following the cash turn in.

''10. An analysis of overages and shortages on each route indicates a pattern of error. On each day almost every driver has an over or a short.

''11. Overages and shortages are assigned to a route regardless of the number of drivers who handle that route.''

welfare'' of women and minors engaged in an occupation in this state.

There can be no doubt that the freedom of all employes to bargain collectively with respect to the terms and conditions of their employment is recognized as basic in our civilization, and that the preservation of that freedom against unjustifiable governmental encroachment is essential to the cause of industrial democracy and hence to the common welfare. By section 923 of the Labor Code "the public policy of this State is declared as follows:

"Negotiations of *terms and conditions of labor* should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable *terms and conditions of employment.* Therefore it is necessary that the individual workman have *full freedom* of association, self-organization, and designation of representatives of his own choosing, *to negotiate the terms and conditions of his employment,* and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'' (Italics added.)[2]

Section 923 of the Labor Code is "a general independent declaration of state policy" (*Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 191 [19] [339 P.2d 801]), and represents an application to the area of collective bargaining of the constitutional right of liberty of contract (see *Chavez* v. *Sargent* (1959), *supra*, 52 Cal.2d at pp. 217-221 [concurring opinion]). That constitutional right is the foundation upon which our free enterprise system has been erected; it must remain free

---

[2]Similarly, on the national level Congress has declared in the Labor Management Relations Act of 1947 (29 U.S.C. § 151) that it is "the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of *full freedom* of association, self-organization, and designation of representatives of their own choosing, *for the purpose of negotiating the terms and conditions of their employment* or other mutual aid or protection.'' (Italics added.)

from arbitrary restraints, and may be limited only by reasonable regulations necessary to safeguard the public health and welfare. Absent such necessity, ''The Legislature may not limit parties in their power to incorporate in their contracts, otherwise valid, such terms as may be mutually satisfactory to them.'' (*Ibid.* at p. 217.)

Typical of the ''terms and conditions of employment'' which may properly be the subject of collective bargaining is the incentive bonus or commission, designed to promote diligence and a high standard of efficiency on the part of the employe. Such an arrangement between persons of mutual good will must inevitably tend to benefit both. The employer, of course, has the benefit of increased productivity or sales flowing from the employe's efforts; the employe, with little risk and with much to gain, acquires the additional status of entrepreneur, making it possible for him to realize tangible rewards for his diligence and care. In incorporating such a provision in a collective bargaining agreement the parties exercise their constitutional freedom to contract, in a manner consonant with the declared public policy of the state. Our decision today should not be interpreted as encouraging further governmental impairment of that essential freedom.

McComb, J., concurred.

Respondent's petition for a rehearing was denied March 21, 1962.