[Civ. No. 45508. First Dist., Div. Two. July 24, 1979.]

JAMES L. QUILLIAN, as State Labor Commissioner, etc., et al.,
Plaintiffs and Respondents, v.
LION OIL COMPANY, Defendant and Appellant.

**COUNSEL**

C. Rex Boyd for Defendant and Appellant.

Guy T. Gurney for Plaintiffs and Respondents.

**OPINION**

MILLER, J.—Lion Oil Company appeals from the judgment of the Santa Clara County Superior Court, sitting without jury, in favor of respondent Louise Marie Garbarino in the amount of $1,536.16, as and for wages.

The uncontested facts reveal that on April 1, 1976, appellant Lion Oil Company (Lion) commenced marketing motor fuels and oils and sundry items through self-serve retail stations, including the two here involved

which were located in San Jose, California, and generally referred to as SS No. 71172 and SS No. 70089.

Commencing April 1, 1976, respondent Garbarino was employed by appellant as a service station manager at the self-serve retail station No. 71172, where she, prior to said date, had been employed in a similar capacity by Phillips Petroleum Company, (Phillips) the former owner of said station. Beginning June 1, 1976, and continuing to March-April, 1977, respondent was employed as a "dual" station manager, that is, as the manager of two self-serve retail stations of Lion—station No. 71172, her headquarter station, plus the additional station No. 70089.

In April 1977, she was demoted and assigned to work as a lead attendant at station No. 71172. Then, effective June 13, 1977, she resigned her employment with Lion to seek other employment.

As a manager, Garbarino was responsible for management and operation of the self-serve retail stations, including, inter alia, supervision of employees (attendants), sales promotions at the stations, control of the stations' stock inventories and expenses, and security protection of merchandise stock and cash. Her work as manager of the self-serve retail stations was predominantly work requiring the exercise of discretion and judgment. Her immediate supervisor was the employer's area sales representative.

While employed as a manager by the employer Lion (and her predecessor employer Phillips), aside from fringe benefits, Garbarino was paid, as wages for work performed, her base salary (fixed amount) plus a monthly bonus (not a fixed amount). Until June 1, 1976, the base salary paid to her was $655 per month; thereafter, the base salary paid to her was $689 per month. Beginning October 18, 1976, she was, by agreement, assured by appellant that the total remuneration paid to her as a manager would in no event be less than $322.31 on a biweekly basis (or the equivalent of $720 on a monthly basis).

Ms. Garbarino was required as a condition of employment to execute a "Salaried Service Station Manager's Bonus Agreement." In the manager's bonus agreement, executed by the manager and employer, their understanding and agreement relating to the incentive bonus payable to the employee as manager were recorded. First, the understanding was set forth that the employee, as manager, would be responsible for the work direction of the other employees (attendants) at the stations. Next

followed the agreement establishing a bonus to be paid to her, in addition to her base salary, "as an incentive to increase sales and reduce cash and merchandise shortage" at the stations. The agreement provided that such incentive bonus payable to her as manager each month would be a calculated amount equal to a dollar amount (determined by reference to an attached schedule of rates applicable to gallonage volumes) for the month's volume of motor fuel sales volume (in gallons) plus 1 percent of volume of other sales (in dollars, excluding taxes) for the month.

An explanation of the bonus payable and its manner of calculation followed and was consistent with the provisions of the bonus agreement: "Shortages are *not* deducted from the bonus which is payable to the manager.

"As an incentive to increase sales and reduce cash and merchandise shortages at each station, a service station manager is paid a monthly bonus which is calculated as follows: *First,* the tentative amount of bonus is determined by application of a bonus schedule for monthly motor fuel sales volumes in gallons, and by computation of one percent of other sales in dollars, excluding taxes; *second,* from said tentative amount, there is deducted any cash or merchandise stock shortage occurring during the period; and the *final result* is the amount payable to the manager as a bonus. Hence you will observe that shortages are not deducted from the bonus payable to the manager. Shortages (if any) are only one of three factors (motor fuel sales volumes; percentage of other sales; merchandise and/or cash shortages) used in calculating the amount which shall be paid to the manager as a bonus incentive."

As provided in the manager's bonus agreement, the incentive bonus paid by the employer had a dual objective—to increase sales and reduce cash and merchandise shortages at the stations managed by the manager. Consistent with such dual objective, the amount paid was measured on the basis of sales volumes, less merchandise or cash shortages at the stations during the month. How well the employer's dual objective was attained, as well as how much was due Garbarino as incentive bonus, was established by reference to the station records of the sales volumes and shortages there.

The manager's bonus agreement was on a form prepared by appellant and recited that appellant reserved the sole right to interpret the terms of the agreement and to change, alter or discontinue the agreement at any time.

Respecting the monthly incentive bonus calculations made pursuant to the terms of the bonus agreement, for each month throughout the period Garbarino worked as a manager, it was not contended, nor did it appear, that any of the shortages used in such calculations resulted from wilful misconduct, dishonesty or gross negligence of respondent or faulty station equipment.

For each month over the period Garbarino worked as manager for appellant, the stations' shortage component was applied against the stations' sales component, to calculate the bonus (if any) payable to and earned by her under the terms of the bonus agreement. The aggregate of such shortages amount to a total of $1,536.16 ($913.28 at station No. 71172 and $622.88 at station No. 70089).

As a result of finding the above facts, the trial court concluded 1) that where there is a promise of a fixed salary and an indeterminate bonus, and where each promise is made to induce a performance, the performances are consideration and the promises are enforceable; 2) that the bonus agreement was for the creation of funds in the form of a contingent bonus against which all losses of the business may be reconciled, in violation of Labor Code sections 400 through 410; 3) that the contract for service station manager's bonus was a contract of adhesion and voidable; and 4) that respondent Garbarino was entitled to judgment.

■ On appeal, appellant contends that the trial court's findings that respondent Garbarino was made the guarantor of appellant's business losses was not supported by the facts and that the court erred in all the above-stated conclusions of law.

Acknowledging that section 221 et seq. of the California Labor Code prohibits deductions from wages due or earned, the thrust of appellant's arguments is that no station cash and merchandise shortages are deducted from the subject manager's bonus.

Appellant asserts that the amount of bonus earned by and payable to the manager is itself calculated or determined by deducting from station sales components, a station shortages component (cash and merchandise stock). It is not the sales volumes and shortages attributable to the manager herself which determine the bonus payable and due the manager for labor performed by the manager. Rather, it is the sales volumes at the station less shortages at the station, without regard to the individual station employee or employees responsible therefor. The

bonus payable to the manager is directly related to the labor performed by her in controlling the station operations to increase sales and reduce shortages.

Appellant further argues that station shortages (cash or merchandise) are not deducted from a bonus earned. Instead, station shortages, if any, constitute one of the essential factors or components used in calculating the amount earned as a bonus, i.e., in calculating that amount which has been earned by and will be paid to the manager as a bonus. Only after such calculation is the compensation which was due her from her employer as bonus determined. The calculated amount due her as bonus is paid without deduction.

In its reply to respondent's trial brief, appellant correctly characterized the issue as whether or not the employer may lawfully offer and pay to a manager an incentive bonus designed to encourage the sales and reduce money shortages at stations under her management, where the amount of such bonus is dependent on both factors (i.e., sales volumes and shortages).

In *Kerr's Catering Service* v. *Department of Industrial Relations* (1962) 57 Cal.2d 319 [19 Cal.Rptr. 492, 369 P.2d 20], the plaintiff, an industrial catering business, maintained a fleet of trucks which were sent to various business and industrial establishments. Each truck was driven by an employee who sold food items which were carried on the truck. Each driver received a minimum wage plus a 15 percent commission on all sales in excess of $475 per week. The percentage commission, payable monthly, was subject to reduction in the amount of any "cash shortage" attributable to the employee during the month. There, as here, the parties stipulated that the deductions from the wages of Kerr's employees were taken from shortages "not caused by a dishonest or wilful act or by the culpable negligence of the employee." Deductions were made, therefore, for losses beyond the employees' control as well as for losses due to simple negligence. The question presented was whether the commission had power to prohibit deductions for cash shortages from employees' commissions even though the affected employees were earning more than the minimum wage.

In analyzing the problem, the court recognized that the employees, through the company's policy of deducting losses, were in effect made insurers of the employer's merchandise, and the commissions earned by the employees which were subject to the deduction, served the same

purpose as an employee's "bond" exacted by the employer to cover shortages. The court then discussed sections 400 through 410 of the Labor Code: "Labor Code sections 400 through 410 set out in detail the employee's bond law, and the manner in which a cash bond may be exacted from an employee to cover merchandise entrusted to him.[1] It provides a criminal penalty for the violation of its provisions. (Lab. Code, § 408.) These deductions from wages due appear to be in contravention of the spirit, if not the letter, of the Employee's Bond Law." (*Id.,* at pp. 327-328.) .

In reply to the plaintiff's contention that the effect of the order is unfair to the employer since the prohibition of deductions for cash shortages placed the burden of the losses upon the employer, the court stated: "But some cash shortages, breakage and loss of equipment are inevitable in almost any business operation. It does not seem unjust to require the employer to bear such losses as expenses of management when it is presently the unchallenged practice to require him to bear, as a business expense, the cost of tools and equipment, protective garments and uniforms furnished to the employee . . . [¶] Furthermore, the employer may, and usually does, either pass these costs on to the consumer in the form of higher prices or lower his employees' wages proportionately, thus distributing the losses among a wide group. In addition, the employer is free to discharge any employee whose carelessness causes the losses, and he is not prohibited from deducting for cash shortages caused by the 'dishonest or wilful act, or by the culpable negligence of the employee.' " (*Id.,* at p. 329.)

Section 200 of the Labor Code defines "wages" as including all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation. Appellant herein

---

[1] Labor Code, section 402, states: "No employer shall demand, exact, or accept any cash bond from any employee or applicant unless:

"(a) The employee or applicant is entrusted with property of an equivalent value, or

"(b) The employer advances regularly to the employee goods, wares, or merchandise to be delivered or sold by the employee, and for which the employer is reimbursed by the employee at regular periodic intervals, and the employer limits the cash bond to an amount sufficient to cover the value of the goods, wares, or merchandise so advanced during the period prior to the payment therefor."

Labor Code, section 403, states: "If cash is received as a bond it shall be deposited in a savings account in a bank authorized to do business in this State, and may be withdrawn only upon the joint signatures of the employer and the employee or applicant.

"Cash put up as a bond shall be accompanied by an agreement in writing made by the employer and employee or applicant, setting forth the conditions under which the bond is given."

describes the subject bonus as a calculated amount consisting of the computed sales component less the computed shortage component and argues that no deductions are made from the final computation. It appears to this court that this is merely a clever method of circumventing the statutory definition of wages. The bonus herein described is, in fact, a scheduled payment based on the number of gallons of motor fuel sold plus a 1 percent commission on other sales. Rather than call this incentive payment a commission and then deduct for shortages in contravention to *Kerr*, appellant deducts shortages from the payment and calls the final result a bonus. Appellant then self-righteously proclaims that no deductions were made from the bonus. Unfortunately, the result is the same. The manager carries the burden of losses from the station.

As the court stated in *Kerr*, "A further reason for legislative disapproval of deductions exists in the reliance of the employee on receiving his expected wage, whether it be computed upon the basis of a set minimum, a piece rate, or a commission. To subject that compensation to unanticipated or undetermined deductions is to impose a special hardship on the employee." (*Ibid.*) Although factored in as one component of the manager's bonus, the deductions herein are as much a hardship as deductions made from final wages.

Therefore, we conclude that the bonus herein is in contravention of the public policy expressed in sections 400 to 410 of the Labor Code pertaining to cash bonds that may be required of employees. As the *Kerr* court stated, section 408 of the Labor Code provides a criminal penalty for violation of these provisions and where a statute prohibits or attaches a penalty to the doing of an act, the act is void even though the statute does not expressly pronounce it so. Accordingly, the imposition by statute of a penalty implies a prohibition of the act referred to and a contract provision founded upon such act is void. (*Kerr's Catering Service* v. *Department of Industrial Relations, supra,* at p. 328.) "Where a contract has several distinct objects of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (Civ. Code, § 1599.) We need not consider whether the subject bonus agreement was a contract of adhesion.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied August 23, 1979, and appellant's petition for a hearing by the Supreme Court was denied September 20, 1979. Bird, C. J., did not participate therein.