In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 16-1850

DAVID COHAN and SUSAN SCHARDT,

*Plaintiffs-Appellants*,

*v.*

MEDLINE INDUSTRIES, INC., and
MEDCAL SALES LLC,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 1835 — **John Robert Blakey**, *Judge*.

---

ARGUED NOVEMBER 4, 2016 — DECIDED DECEMBER 9, 2016

---

Before FLAUM and KANNE, *Circuit Judges*, and MAGNUS-STINSON, *District Judge*.[*]

FLAUM, *Circuit Judge*. Plaintiffs David Cohan and Susan Schardt filed this putative class action suit against their former employers, Medline Industries, Inc., and MedCal Sales

---

[*] Of the Southern District of Indiana, sitting by designation.

LLC (collectively, "Medline"), alleging violations of the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. § 115/1 *et seq.* ("IWPCA"), and other state wage payment statutes, including the New York Labor Law and California Labor Code, on behalf of the class. Cohan and Schardt claimed that Medline's practice of accounting for year-to-year sales declines in calculating and paying commissions was impermissible under the terms of their employment agreements and state wage laws. The district court granted Medline's motion for summary judgment, finding that plaintiffs had not performed enough work in Illinois for the IWPCA to apply and that Medline and the plaintiffs had agreed to Medline's method of calculating commissions, so there was no violation of state wage laws. Cohan and Schardt appealed the dismissal of their claims under New York and California law. We affirm.

## I. Background

Medline Industries, Inc., is a national manufacturer and distributor of healthcare supplies, and MedCal Sales LLC is its subsidiary. Both are headquartered in Mundelein, Illinois. Medline employed Sales Representatives from around the country in their Advanced Wound Care ("AWC") division. AWC salespeople were assigned their own geographic territory and were responsible for selling AWC products to new or existing clients within that territory.

Cohan, a New York resident, worked as a Sales Representative in the AWC division from 2007 to 2013. (He previously worked in Medline's General Line Division from 1992 to 2007.) As an AWC Sales Representative, he sold Medline's products in a territory primarily consisting of New York accounts. Schardt, a California resident, was a Sales Representative in the AWC division from 2001 to 2014, and her territory

largely consisted of California accounts. As AWC salespeople, both Cohan and Schardt received a base salary as well as commissions on sales of AWC products to accounts within their assigned territory.

Both Cohan and Schardt entered into written employment agreements with Medline. Cohan's original Employment Agreement was dated March 25, 1999 (the "1999 Agreement"). When he transferred to the AWC division, Cohan also entered into an Agreement Regarding Continued Employment dated November 26, 2007 (the "2007 Agreement"). The 2007 Agreement amended the 1999 Agreement, such that the latter stayed in effect, as amended. The 1999 Agreement at ¶ 6 provides the following with respect to commissions:

> (a) Subject to the provisions hereafter set forth, Medline shall pay to Salesperson commissions with respect to the collections of all sales made by Medline to customers in the territory … provided the collection date of any such sale is on or after the date Salesperson commences performance of his duties as a salesperson hereunder and is on or before the effective date of termination of this Agreement under any circumstances. Salesperson shall be entitled to a commission on any sale as set forth herein, irrespective of whether Salesperson shall have been responsible for such sale … .
>
> …
>
> (f) [C]ommissions on sales for which the collections are received by Medline prior to the last

day of any fiscal month shall be paid to Salesperson on or about the 15th day of the next calendar month.

…

(h) Medline may at any time elect to compensate Salesperson on the basis of a monthly salary plus commissions or on the basis of a commission program. After making such election, Medline may periodically vary the amount of salary and/or the rate of commission pursuant to such election.

…

(k) During the term of the notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement,[1] commissions shall be deemed earned by Salesperson only if collected prior to the effective date of termination of this Agreement under any circumstances. All commissions so earned during the term of such notice period shall be paid to Salesperson, provided Medline receives actual payment from the customer prior to termination date.

---

[1] Paragraph 10 dealt with termination, and section (a) stated: "The term of this Agreement shall continue indefinitely, provided however, that either Salesperson or Medline may terminate this Agreement at any time by giving written notice of such termination to the other party, not less than fourteen (14) calendar days prior to the effective date of termination specified in such notice."

Cohan's 2007 Agreement further specified that Cohan would be compensated in part through a "[c]ommission plan based on sales growth year over year for assigned territory."

Schardt worked for Medline pursuant to two Employment Agreements: one dated February 19, 2001, between her and Medline, and another dated February 10, 2006, between her and MedCal. Schardt's two Agreements are substantively identical to one another, and to Cohan's 1999 Agreement, and contained the same provisions as those excerpted above.[2]

In addition, Medline's AWC division released on an annual basis Compensation Plans describing how commissions would be calculated during that year for its Sales Representatives. The Compensation Plans from 2004 to 2007 explain that "[c]ommissions are based on monthly sales growth and profitability," and specify that growth commissions are to be calculated as follows: (current year monthly sales - prior year monthly sales) x WC Base Profit %[3] x 20% = Commission. They each provide some version of the following example:

---

[2] For example, subsection 6(f) in Cohan's 1999 Agreement and Schardt's 2006 Agreement is substantively identical to subsection 6(e) in Schardt's 2001 Agreement; and paragraph 6(k) in Cohan's 1999 Agreement and Schardt's 2006 Agreement is substantively identical to subsection 6(i) in Schardt's 2001 Agreement.

[3] WC presumably stands for Wound Care, and WC Base Profit % (also referred to as WCBP%) is defined in the 2004 Compensation Plan as the profitability over base cost for each item sold. The average WCBP% is 28.5%, but WCBP% varies by territory and month.

| | |
|---|---|
| January 2004 Sales: | $165,000 |
| January 2003 Sales: | -$125,000 |
| Monthly Growth: | = $40,000 |
| x WC Base Profit (28.5%): | = $11,400 |
| x 20%: | = $2,280 (commission) |

The Compensation Plans for 2010 to 2014 stated that sales-people were entitled to a commission paid on sales growth but did not include any sample calculations.[4] The Compensation Plans were typically explained to AWC Sales Representatives in December or January of each year at the annual AWC kick-off "promo meeting."

Medline calculated commissions by starting with the salesperson's invoiced sales for the current month and subtracting their sales from the same month in the prior year. Depending on whether the salesperson sold more or less than in the year prior, that calculation could result in a positive or negative sales growth number. To calculate commission based on sales growth, Medline then multiplied the salesperson's growth (or decline) by a commission percentage. In some years, commissions were calculated by multiplying the

---

[4] Neither party references the Compensation Plans for 2008 and 2009. The 2008 Compensation Plan referred to a "Total Goal Achievement Bonus" and explained that "Total Sales Goal = Individual Territory Growth Goal + 2007 Base Sales" and "Bonus Payout = .2% of Territory Base Sales plus 2% of the sales Growth." The 2009 Compensation Plan noted with respect to the "Total Goal Achievement Bonus" that "If you hit your sales goal you get 7% on the Growth up to your goal amount," "You will also get paid ½% on your base sales," and "finally you will get 10% on all sales growth above goal." Commissions were thus still tied to growth in these Plans.

growth figure for each product category by a specific commission percentage assigned to that category. In other years, the commission percentage was applied to the salesperson's overall territory sales growth. Regardless, the calculation always included all of the salesperson's business, including accounts with positive and negative sales growth. If a salesperson had negative net growth, this would result in a negative commission, which was then subtracted from any positive commissions. Medline accounted for such negative commissions even where the reason for the decline in year-over-year growth was outside the Sales Representative's control (*e.g.*, if accounts reduced purchases due to natural disasters, or had already been in decline before being assigned to a Sales Representative's territory).

**Medline's Practice:**

|  | Jan. 2010 sales | Jan. 2011 sales | Year-over-year change | Commission earned (5%) |
|---|---|---|---|---|
| Account 1 | $500K | $1,500K | +$1,000K | $50K |
| Account 2 | $500K | $100K | -$400K | -$20K |
| Account 3 | $500K | $0K | -$500K | -$25K |
|  |  |  | Total: | $5K |

From 2007 to 2012, the commission calculation also included a "carryover" component, such that an AWC salesperson with a negative overall territory sales growth in one month was required to cover this loss with any positive sales growth in subsequent months. In 2013 and 2014, this practice changed, so that if any AWC Sales Representative had negative overall territory sales growth for the month, it was zeroed out and was no longer carried over into subsequent months.

In addition to the annual Compensation Plans discussed above, AWC Sales Representatives received at least two other reports detailing their sales growth and commissions each month: (1) the Wound Care Commission Summary and Growth Report, and (2) the Commission Summary by Item Detail Report (also referred to as the Detailed Commission Report). AWC salespeople had access to these reports each month through Medline's intranet.

The Wound Care Commission Summary and Growth Report showed each Sales Representative's sales for the month compared to the same month in the prior year, broken down by product groupings for the salesperson's entire territory. It also included a chart titled "Commissions Calculation," which reported commissions for each product category (whether positive or negative) based on that month's sales growth. A line labeled "Total Commission" showed the sum of all commissions for the month, adding the positives and negatives together across all product categories.

The Commission Summary by Item Detail Report showed sales growth in additional detail, including by account and by product. This report also included a column labeled "Commissions $," which listed a positive or negative dollar figure for each account and product. The report correlated the Sales Representative's (positive or negative) sales growth to (positive or negative) commissions by account and item.

In 2014, after leaving Medline's employment, Cohan filed this lawsuit on behalf of a putative class of all current and former Medline salespeople nationwide, alleging, after several amendments, that Medline unlawfully deducted wages without written authorization in violation of the IWPCA and the

wage laws of the residence states of all putative class members. Cohan and Schardt contended that under the Employment Agreements and Compensation Plans, when they failed to grow sales year over year, they simply should not have earned commissions (*i.e.*, negative growth should have been zeroed out so that they were paid only on positive growth).

**Cohan's and Schardt's Position:**

|  | Jan. 2010 sales | Jan. 2011 sales | Year-over-year change | Commission earned (5%) |
|---|---|---|---|---|
| Account 1 | $500K | $1,500K | +$1,000K | $50K |
| Account 2 | $500K | $100K | -$400K | $0K |
| Account 3 | $500K | $0K | -$500K | $0K |
|  |  |  | Total: | $50K |

As of 2015, Cohan and Schardt were the two named plaintiffs representing the class.[5] The parties filed cross-motions for summary judgment, and the district court stayed proceedings on class certification to resolve the parties' cross-motions for summary judgment on Cohan's and Schardt's individual claims.

The district court granted Medline's motion for summary judgment in full and denied Cohan's and Schardt's motion in full. With respect to the IWPCA claims, it found that plaintiffs

---

[5] Also in 2015, Medline amended its written Compensation Plans to be consistent with plaintiffs' position in this lawsuit, such that where "year over year comparison yields a total negative value within a particular category, [sales representatives] will receive no additional component for sales growth in that category." That is, failure to grow sales simply resulted in zero commission, rather than a negative commission.

had not performed enough work in Illinois for the Act to apply to them. It also found no indication that commissions were earned by Cohan and Schardt before the calculation of commissions (by subtracting negative growth) was complete. Because there was no agreement by Medline to pay commissions in the manner understood by Cohan and Schardt, and because plaintiffs had provided no other evidence that they were entitled to a commission calculation that ignored negative sales growth, the district court ruled that Medline's commission structure did not violate state wage laws. Cohan and Schardt now appeal only the dismissal of their claims under New York and California law.

## II. Discussion

We review de novo a district court's grant of summary judgment, construing all facts and drawing all reasonable inferences in favor of the non-moving party—here, Cohan and Schardt. *See C.G. Schmidt, Inc. v. Permasteelisa N. Am.*, 825 F.3d 801, 805 (7th Cir. 2016) (citation omitted). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *C.G. Schmidt*, 825 F.3d at 805.

State wage laws generally protect employees' earned wages, including commissions, from an employer's unlawful deductions. *See, e.g.*, N.Y. Labor Law §§ 190(1), 191(1)(c), 193(1); Cal. Labor Code § 221.[6] In both New York and California, whether and when a commission is earned is dependent

---

[6] As the district court noted below, it is unclear whether there is a private right of action under Cal. Labor Code § 221. *Compare Mouchati v. Bonnie Plants, Inc.*, No. EDCV 14-00037-VAP, 2014 WL 1661245, at *8 (C.D. Cal.

upon the terms of the agreement providing for such commission. *See Gennes v. Yellow Book of N.Y., Inc.*, 23 A.D.3d 520, 521 (N.Y. App. Ct. 2005); *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1330 (1st Dist. 2006) ("The right of a salesperson or any other person to a commission depends on the terms of the contract for compensation.") (citations omitted).

The district court found that under the employment agreements and Compensation Plans, plaintiffs' commissions were not earned until the growth calculation was completed. Any alleged deduction was thus not improper under state wage law, but in accordance with the parties' agreements.

On appeal, Cohan and Schardt argue that a decline is not part of the ordinary meaning of the term "growth," and characterize "negative growth" as an oxymoron inconsistent with the plain language of the agreements. They contend that at summary judgment, the district court should have interpreted "growth" in the light most favorable to them (*i.e.*, as encompassing only positive growth), such that their commissions were earned as soon as their customers paid Medline, and Medline's accounting for negative growth constituted improper deductions from earned commissions.

Plaintiffs emphasize that the Employment Agreements contain no reference to "net" growth or "negative commissions," and point to the below bolded language from paragraph 6 of their employment agreements as evidence that

---

Mar. 6, 2014), *with Villalpando v. Exel Direct Inc.*, No. 12-cv-04137 JCS, 2014 WL 1338297, at *18 (N.D. Cal. Mar. 28, 2014). The district court based its decision on the merits of plaintiffs' claims and thus reached no conclusion regarding the existence of a private right of action under § 221. We do the same.

their commissions were fully "earned" upon payment by the customers to Medline (and prior to any subtraction for "negative growth"):

> … Medline shall pay to Salesperson commissions with respect to the collections of all sales made by Medline to customers in the territory … provided **the collection date of any such sale** is on or after the date Salesperson commences performance of his duties as a salesperson … .

> [C]ommissions on sales **for which the collections are received** by Medline prior to the last day of any fiscal month shall be paid to Salesperson on or about the 15th day of the next calendar month. …

> During the term of the notice period, or any portion thereof, provided for by Paragraph 10(a) of this Agreement, commissions shall be deemed **earned by Salesperson only if collected** prior to the effective date of termination of this Agreement under any circumstances. All commissions **so earned** during the term of such notice period shall be paid to Salesperson **provided Medline receives actual payment from the customer** prior to termination date.

However, these provisions do not explain when commissions are earned; rather, they partially define what commissions are (by explaining what sales count for commissions) and specify when commissions are to be paid (the fifteenth

day of the following month).[7] Although the last section arguably has more specific language about commissions "earned" upon collection of payment, it is explicitly limited to termination notice periods.

The employment agreements are silent on the relevant issue, but Medline's Compensation Plans filled that gap. The parties agree that the Plans are controlling instruments with respect to plaintiffs' claims. The 2004 to 2007 Compensation Plans clearly and unambiguously explained how commissions were to be calculated: (current year monthly sales - prior year monthly sales) x WC Base Profit % x 20% = Commission. Although plaintiffs emphasize that the examples in the Compensation Plans showed positive monthly growth year over year, resulting in a positive number in commission compensation, it is clear as a matter of basic math that where year-to-year sales declined, the calculation would result in a negative growth number and thus a negative commission. The other Compensation Plans and Cohan's 2007 agreement likewise tie commissions to growth, which, as clearly established by the 2004 to 2007 Plans, included negative growth.

Cohan and Schardt contend that regardless, "any disagreement between the parties regarding the scope of their written agreements and policies should have precluded … summary judgment." However, "[i]f an agreement lends itself to one reasonable interpretation only, it is not ambiguous and can be construed as a matter of law." *Chi. Reg'l Council of Carpenters Pension Fund v. Schal Bovis, Inc.*, 826 F.3d 397, 406 (7th

---

[7] The 2004, 2005, and 2006 Compensation Plans similarly provide that "Commissions are based on monthly sales growth and profitability and paid in the 15th check for previous month's sales."

Cir. 2016) (citing *Mazzei v. Rock N Around Trucking, Inc.*, 246
F.3d 956, 960 (7th Cir. 2001)). The district court's finding was
not a matter of "constru[ing] the language of the agreements"
in a light unfavorable to the plaintiffs. Rather, it found that the
parties' agreement (comprising the employment agreements
and Compensation Plans) clearly and unambiguously pro-
vided for negative growth being taken into account when cal-
culating commissions.

Plaintiffs also take issue with the district court's discussion
of their continued employment with Medline after becoming
aware of the alleged deductions through the Wound Care
Commission Summary and Growth Report, the Commission
Summary by Item Detail Report, and discussions with their
supervisors and Medline executives. They claim that the court
improperly considered this extrinsic evidence, and that their
continued employment with Medline is insufficient to show
assent to a "modification" of their compensation agreements.
The district court's opinion does merge discussion of Cohan's
and Schardt's continued employment at Medline with its
analysis of when commissions are "earned," both to under-
score plaintiffs' failure to show any mutual assent to commis-
sions being paid as they propose, and, with respect to plain-
tiffs' IWPCA claims, to note evidence of implied acceptance of
Medline's payment terms under Illinois law. Ultimately, how-
ever, the district court could have reached its conclusion, as
we do, based on the plain language of the agreements.

Because Medline's accounting for negative growth was not
a deduction from earned commissions, but rather the con-
tracted-to means of calculating commissions in the first place,
Medline did not violate § 193(1) of New York Labor Law or
§ 221 of the California Labor Code. *Pachter v. Bernard Hodes*

*Grp., Inc.*, 10 N.Y.3d 609 (2008), and *Koehl*, 142 Cal. App. 4th 1313, are instructive:

The plaintiff in *Pachter* sued her former employer for "subtracting business expenses from her percentage of client billings in arriving at her commission income." 10 N.Y.3d at 614. The Court of Appeals of New York held that N.Y. Labor Law § 193 does not bar employers from structuring payment arrangements that include "downward adjustments" in calculating commissions. *Id.* at 617–18. Because there was an implied contract between the parties under which "the final computation of the commissions earned … depended on first making adjustments for nonpayments by customers and … work-related expenses," neither § 193 nor any other provision of New York's Labor Law prevented the employer's structuring and application of the commission formula. *Id.* at 618.

The plaintiffs in *Koehl* sued their former employer, an Internet service provider, for its use of a "chargeback process" against commissions. 142 Cal. App. 4th at 1325–1326. When an installation order was cancelled before a customer paid for the first three months, the employer would "charge back" and recover previously advanced sales commissions, essentially undoing the transaction at issue. *Id.* The California Court of Appeal held that these chargebacks did not violate § 221 of the California Labor Code because the commission plans between the parties provided that although commissions would be paid at booking or installation, they were not in fact earned at that time. *Id.* at 1334 ("Appellants agreed to what they agreed to, and that agreement will be enforced … ."); *see also id.* at 1331 ("In sum, cases have long recognized, and enforced, commission plans agreed to between employer and em-

ployee, applying fundamental contract principles to deter-
mine whether a salesperson has, or has not, earned a commis-
sion."). Like the business expenses in *Pachter*, and the charge-
backs in *Koehl*, Medline's accounting for negative growth was
part of the calculation of what commission was to be
"earned," per the agreement of the parties.

Plaintiffs also contend that Medline's practice from 2007 to
2012 of carrying over any balance owed for negative commis-
sion to offset future positive commissions constitutes an im-
permissible deduction from wages under both New York and
California law. They argue that this concept is not contem-
plated in the agreements, but cite to no case law in support of
their position. As this carryover practice was merely how
Medline implemented its calculation of earned commissions,
the same logic outlined above applies, and Medline acted in
accordance with its agreements. We can similarly dispose of
plaintiffs' argument that prompt and full payment of wages
due to an employee is a fundamental public policy in both
New York in California. While that certainly is true, under the
parties' agreements, commissions were not earned or "due"
until after negative growth was taken into account.

Plaintiffs next argue that even if Medline's commission
structure is consistent with the written agreements, it is nev-
ertheless a *per se* violation of New York and California labor
law because it impermissibly recoups Medline's business
losses from its Sales Representatives, even when those losses
are outside Sales Representatives' control. Plaintiffs contend
that this precise compensation practice was rejected by New
York courts in *Gennes v. Yellow Book of N.Y., Inc.*, 776 N.Y.S.2d
758 (N.Y. S. Ct. 2004), *aff'd*, 23 A.D.3d 520, 521 (N.Y. App. Div.
2005). The employer in *Gennes* had a written policy providing

for a deduction from account executives' commissions for every existing account that they were assigned but failed to renew. The court held that the employer could not "deduct[] from employees [*sic*] paychecks any wages already earned unless so required by law or for the benefit of the employee," and noted that otherwise, "employees would suffer negative economic consequences through no fault of their own if a business did not renew its subscription," since subscriptions could lapse due to "economic downturn" or "advertising with another publication." *Id.* at 760. Cohan and Schardt highlight that they similarly had negative growth factored into their commissions even when it resulted from events outside their control, such as natural disasters. However, *Gennes* explicitly dealt with chargebacks against "commissions *already earned* on advertisements," *id.* at 759 (emphasis added), whereas in our case, the agreement between the parties specifies that commissions are earned in the first instance based on sales growth, including negative growth. *See Gennes*, 23 A.D.3d at 521 ("Whether a commission is earned is dependent upon the terms of the agreement providing for such commission.").

Plaintiffs' argument under California case law for a *per se* violation is somewhat more persuasive. In *Hudgins v. Neiman Marcus Grp., Inc.*, 34 Cal. App. 4th 1109 (1995), *as modified* (May 25, 1995), the California appellate court considered whether Neiman Marcus violated California labor law by deducting a pro rata share of commissions previously paid from all sales

associates in the section of the store where there were "uni-dentified returns."[8] It held that this unidentified-returns pol-icy caused forfeiture of commissions legitimately earned in order to insure Neiman Marcus against its own business losses, and explicitly ruled that "Neiman Marcus cannot avoid a finding that its unidentified returns policy is unlawful simply by asserting that the deduction is just a step in its cal-culation of commission income." *Hudgins*, 34 Cal. App. 4th at 1123–24. In so holding, the court cited to *Quillian v. Lion Oil Co.*, 96 Cal. App.3d 156 (1979), which held that paying gas sta-tion managers an "incentive bonus" based on the amount of gasoline sold, with a deduction for any cash or merchandise shortages, similarly violated § 221 of the California Labor Code. The California Court of Appeal rejected Lion Oil's ar-gument that § 221 did not apply because accounting for cash and merchandise shortages were merely part of the calcula-tion of the bonus, rather than a deduction from the bonus. *Quillian*, 96 Cal. App.3d at 163.

*Hudgins* and *Quillian* establish that employers cannot shift general business losses onto their employees and avoid liabil-ity by dressing up the deduction as part of the commission's "calculation." Medline's commission policy arguably does in-sure itself against business declines to some extent. However, in contrast to the *Hudgins* unidentified returns policy that merely prorated unidentified returns across all sales associ-ates in the department, and the *Quillian* bonus policy that ac-

---

[8] These included returns of merchandise for which the original sales associate could not be identified or where the original sales associate had not been employed by Neiman Marcus for over six months. *Hudgins*, 34 Cal. App. 4th at 1114.

counted for shortages "without regard to the individual station employee or employees responsible therefor," at Medline, each commission is specifically tied to the territory assigned exclusively to that Sales Representative. This tethering of commissions to growth within each salesperson's territory thus lessens the concerns about unfairness underlying the reasoning and holdings in *Hudgins* and *Quillian*. Medline's practice appears more akin to accounting for *identified* returns in *Hudgins* (which was deemed lawful), or the chargeback system deemed acceptable in *Koehl*. *See Koehl*, 142 Cal. App. 4th at 1336 ("[In *Hudgins*,] we noted that the store's practice of recovering commissions on identified returns *was* acceptable because those chargebacks were specifically tied to the sales in which the associate had been involved and for which the associate had received a direct benefit in the form of a commission. Here, of course, the chargebacks are sales associate by sales associate, order by order.") (citation omitted).

Moreover, § 6(a) of the Employment Agreements provides that Sales Representatives shall earn commission from sales in their territory "irrespective of whether Salesperson shall have been responsible for such sale." Although plaintiffs contended at oral argument that it would be "unusual" for sales to occur in a salesperson's territory without the salesperson's involvement, this language highlights that Cohan and Schardt could have also benefitted from business gains in their assigned territories for which they were not necessarily responsible (*e.g.*, a client's growth resulting in additional purchases from Medline).

In sum, unlike the commission schemes in *Hudgins* and *Quillian*, Medline's inclusion of negative growth in its com-

mission calculation was not an unlawful deduction in disguise, but rather a valid means of incentivizing their salespeople to grow business year over year in their assigned territories. As the parties agreed that Medline could use both the carrot and the stick in promoting growth, the district court correctly granted summary judgment in Medline's favor.[9]

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[9] Because Medline paid commissions consistent with its agreements with plaintiffs and applicable state wage laws, we need not address plaintiffs' argument that Medline violated § 223 of the California Labor Code, which provides that, "[w]here any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract."