Filed 1/4/22  Tessitore v. Macy's West Stores CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CRAIG TESSITORE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>MACY'S WEST STORES, INC.,<br><br>Defendant and Respondent. | D078292<br><br><br>(Super. Ct. No. 37-2018-<br> 00044691-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.

Law Offices of Kirk D. Hanson, Kirk D. Hanson; Esner, Chang & Boyer, and Stuart B. Esner, for Plaintiff and Appellant.

Jackson Lewis, Christine M. Fitzgerald, Lara P. Besser; Macy's Law Department, and David E. Martin, for Defendant and Respondent.

Craig Tessitore appeals a judgment in favor of his employer, Macy's West Stores, Inc. (MWS), on Tessitore's causes of action under the Labor Code Private Attorneys General Act (PAGA; Lab. Code, § 2698 et seq.).[1]

---

[1]     Subsequent statutory references are to the Labor Code unless otherwise stated.

Tessitore primarily claimed that MWS's commission-based compensation program for sales employees violates the Labor Code's prohibitions on improper wage deductions (§ 221) and secret underpayment of wages (§ 223) by effectively reducing an employee's compensation when a customer later exchanges an item for essentially the same item (an "even exchange") or when a customer requests and receives a credit because an item has gone on sale after purchase (a "price adjustment").  Tessitore and MWS filed cross-motions for summary judgment on these issues.  The trial court found that MWS's compensation program did not violate the Labor Code, granted MWS's motion, denied Tessitore's motion, and entered judgment accordingly.

On appeal, Tessitore contends MWS's compensation program is unlawful for the same reasons as in the trial court.  We disagree.  MWS's compensation program pays commissions based on an employee's net sales in a given work week.  The net sales figure is calculated by taking an employee's gross sales and subtracting returns, exchanges, and price adjustments.  MWS promises to pay commissions based on this calculation, and it is undisputed that it does so.  Because MWS pays its employees according to the terms of its compensation program, its employees do not suffer any wage deduction under section 221 or secret underpayment under section 223.  And, while an employer may not impose unlawful wage deductions under the guise of a calculation or formula, MWS's even exchange and price adjustment policies do not run afoul of California's wage protection statutes.  We therefore affirm the judgment in favor of MWS and against Tessitore.

## FACTUAL AND PROCEDURAL BACKGROUND

Tessitore has worked for MWS or its predecessors for over 30 years. For the past decade, he has been employed as a "draw versus commission" sales associate at an MWS store in San Diego.  In 2017, MWS instituted a

2

new compensation program for commissioned sales employees. The program is described in an MWS publication entitled, "Understanding Commission: An Associate's Guide to Macy's Commission Pay Plans." The program's stated purpose is "to provide associates with an incentive to increase their overall Sales Productivity with respect to the sale of commission-eligible merchandise."

A key component of the compensation program is " 'Commission Sales Productivity,'" which the "Understanding Commission" publication describes as "that amount equal to [the employee's] total Net Sales of commission-eligible merchandise in a particular work week." The publication explains, "The calculation and payment of Commission Pay are not made on the basis of [the employee's] sales of individual items of merchandise. Rather commission pay is based on your Commission Sales Productivity, or overall Net Sales of commission-eligible merchandise, for a particular work week."

The program defines " 'Gross Sales'" as essentially the purchase price and other amounts paid by the customer for all merchandise sold in a particular week. The program defines " 'Net Sales'" as "that amount equal to the Gross Sales minus discounts (such as employee discounts and back office discounts), taxes, Price Adjustments, and Eligible Returns made in that work week." For example, if a sales associate sells two pairs of $200 shoes, plus a $20 delivery fee and $35.70 in taxes, the associate's gross sales for that week would be $455.70 and his net sales would be $400. His commission sales productivity would likewise be $400, which would be used to calculate the associate's commission pay for the week.

MWS has an eligible return period of 180 days. Under the program, "[r]eturns within the Eligible Return Period are attributed to the Original Associate." Continuing the example above, if a few weeks later the associate

3

makes $10,300 in gross sales, but a customer returns one previously-purchased $200 pair of shoes, the amount of the return would be subtracted from the associate's gross sales for the week, resulting in $10,100 in net sales.

Merchandise returned as part of an exchange is treated as a return for purposes of MWS's compensation program. The "Understanding Commission" publication states, "Sometimes a customer returns merchandise and makes another purchase. In fact, you should treat all returns as an opportunity to increase your Commission Sales Productivity." It goes on to explain, "An 'Even Exchange' occurs when the customer returns merchandise and replaces it with essentially the same item. For example, she returns a shirt in Medium and replaces it with the same item in Large. Even Exchanges within the Eligible Return Period are treated as a return attributed to the Original Associate and a sale attributed to the associate processing the exchange." Similarly, "[a]n 'Uneven Exchange' occurs when the customer returns merchandise and then purchases something different. . . . Uneven Exchanges within the Eligible Return Period are treated as a return attributed to the Original Associate and a sale attributed to the associate processing the exchange."

A related transaction is a price adjustment. "A 'Price Adjustment' occurs when, in accordance with [MWS's] return policies, a customer requests and receives a credit due to merchandise going on sale after the original date of purchase. . . . Because a Price Adjustment happens within the Eligible Return Period, the amount of the Price Adjustment is considered a Return and is applied against the Original Associate's Net Sales for the work week that the Price Adjustment is made."

A sales associate's commission pay is calculated each week and earned when paid. As the "Understanding Commission" publication explains,

4

"Commission Pay is earned when the audit and verification of your Commission Sales Productivity, or overall Net Sales of commission-eligible merchandise for the work week, are completed. The auditing and verification of your Commission Sales Productivity for a work week is completed when you receive your Commission Pay for that work week." In addition to commission pay, "draw versus commission" sales employees like Tessitore receive standard hourly wages equal to the minimum wage in the locality where they work.[2]

Tessitore's operative PAGA complaint challenged the even exchange and price adjustment aspects of MWS's compensation program. His first cause of action alleged that the program violates section 221 because it subjects him to "unlawful deductions from his earned commission wages under [MWS's] illegal commission chargeback schemes." Specifically, Tessitore alleged the even exchange and price adjustment policies deducted wages from the earned commissions of the employee who originally made the sale. In Tessitore's view, under the even exchange policy, the commission previously paid is "taken back by [MWS] through a deduction from the Sales Employee's wages, and the commission is then paid to the Sales employee who made the exchange, despite the fact that the Sales Employee who made the exchange performed no work to generate the sale." Under the price adjustment policy, MWS receives the difference in commissions, thereby

[2] As the name suggests, in addition to commission pay and standard hourly wages, "draw versus commission" employees can also receive "draws" (i.e., advances) on future commission pay. This aspect of MWS's compensation program is not at issue in this appeal. Other employees, called "Base +" associates, receive commission pay and a standard hourly wage that may be higher than minimum wage. MWS uses the same calculation for commission pay for both "draw versus commission" and "Base +" employees, and Tessitore's PAGA claims cover both types of employees.

5

"illegally shift[ing] [MWS's] cost of doing business to the Sales Employees by forcing these employees to subsidize the reduction in price of [MWS's] merchandise by giving back the commissions they earned on the original sale through illegal deductions from their commission wages." Tessitore's second cause of action alleged that the even exchange and price adjustment policies violated section 223 because they resulted in underpayment of wages that was kept secret from California's enforcement agencies. His third cause of action alleged violations of sections 201, 202, and 203 because MWS's underpayment of wages resulted in a failure to pay wages in full when an employee resigns or is discharged. Tessitore sought civil penalties and attorney fees under PAGA.

MWS moved for summary judgment on Tessitore's claims. It contended that its compensation program did not result in any deductions, illegal or otherwise, from Tessitore's earned commissions. It paid him according to the program's terms and did not withhold any amounts. Moreover, because the even exchange and price adjustment policies were tied to specific sales Tessitore made, MWS did not shift its cost of doing business to him.

MWS relied on deposition testimony from its executive in charge of the commission-based compensation program. For even exchanges, the executive explained that the original associate "didn't complete the sale" because, for example, "the size wasn't correct and the [associate] didn't . . . have the person try on the product; the color wasn't correct, and they told them they looked great in it and they didn't. So there are . . . many different reasons why that sale wasn't completed, but what's most important is it wasn't completed." For price adjustments, the executive explained that MWS has sales promotions "to help drive traffic into the stores to drive sales and, ultimately, help the sales colleagues generate commission[.] Get the foot

6

traffic in the door." A customer can request a price adjustment within 10 days of purchase. The price adjustment policy "help[s] save the sale" for the original associate, because otherwise the customer would simply return or exchange the merchandise, thereby reducing the original employee's net sales for the period by the full amount of the returned or exchanged merchandise.

In his deposition testimony, Tessitore agreed that sales promotions are a tool to help him generate more sales. He explained that his department has regular sales and it is "rare" when nothing is on sale. It can be a "challenge" when there are no active sales. When customers see sale items "it brings them in. . . . That's usually a good thing." Tessitore also agreed that MWS's price adjustment policy is a tool to help him sell merchandise, because he can tell customers they can come back and get a credit if the merchandise later goes on sale. The compensation program's treatment of price adjustments preserves a part of the benefit for the original associate who made the sale.

Tessitore moved for summary judgment as well. He contended that MWS's even exchange policy violated California's "procuring cause" rule, and sections 221 and 223, because it took away the earned commission wages from the employee who procured the sale and gave them to another employee. He contended that the price adjustment policy violated sections 221 and 223 because "it forces the employee to share [MWS's] business costs associated with [MWS's] decision to put merchandise on sale after it has been sold by the employee at the original price."

Based on the "Understanding Commission" publication and the testimony of the MWS executive, Tessitore emphasized that commission wages are earned when paid by MWS to the employee. They are not mere

7

advances on future wages. In Tessitore's view, the deductions used to calculate net sales, based on even exchanges and price reductions, took back wages earned in prior weeks. MWS could not defend the practice by claiming that these deductions were simply steps in calculating the commissions due to the employee.

After hearing argument, the trial court issued a written order granting MWS's motion for summary judgment and denying Tessitore's motion. It found, "Based on the terms of the ['Understanding Commission' publication], [Tessitore] agreed that his Commission Pay would be based on his Commission Sales Productivity; [Tessitore] agreed that his Commission Sales Productivity would be based on his Net Sales; and [he] agreed that his Net Sales would be calculated by subtracting, *inter alia*, Price Adjustments and Eligible Returns made in the work week from [his] Gross Sales in the same work week. Since the ['Understanding Commission' publication] defines the 'Eligible Return Period' as 180-days, [Tessitore] agreed to a chargeback procedure whereby newly earned commissions are subject to reduction via a chargeback of previously earned commissions for 180-days after the commission is earned." Relying on *Steinhebel v. Los Angeles Times Communications, LLC* (2005) 126 Cal.App.4th 696 (*Steinhebel*), the court found that MWS's policies did not violate the Labor Code. The court did not find Tessitore's emphasis on "earned" wages persuasive. It explained, "Irrespective of use of the term 'earned,' [Tessitore] agreed that his Commission Pay is earned based on calculation of his Commission Sales Productivity and his Commission Sales Productivity for any week is calculated based on a reduction for Price Adjustments and Eligible Returns made on sales from previous weeks." It reasoned that Tessitore's commissions "are not actually 'earned' until all of the legal conditions

8

precedent have been met, i.e., until all reductions for Price Adjustments and Eligible Returns are taken, as calculated by the Commission Sales Productivity." The court entered judgment in favor of MWS, and Tessitore appeals.

## DISCUSSION

## I

### *Summary Judgment Standards*

" 'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion." (*Regents of the University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).)

"Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' " (*Regents*, *supra*, 4 Cal.5th at p. 618.) "A plaintiff or cross-complainant has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on the cause of action. Once the plaintiff or cross-complainant has met that burden, the burden shifts to the defendant or cross-defendant to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(1).) "A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if the party has shown that one

9

or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (*Id.*, subd. (p)(2).)

"We review the record and the determination of the trial court de novo." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) "Furthermore, '[i]t is axiomatic that we review the trial court's rulings and not its reasoning.' [Citation.] Thus, a reviewing court may affirm a trial court's decision granting summary judgment for an erroneous reason." (*Coral Construction, Inc. v. City & County of San Francisco* (2010) 50 Cal.4th 315, 336 (*Coral Construction*).) We are not bound by the trial court's stated reasons for granting summary judgment. (*Canales v. Wells Fargo Bank, N.A.* (2018) 23 Cal.App.5th 1262, 1268 (*Canales*).)

II

*Unlawful Wage Deductions*

This appeal concerns the wages earned by MWS sales employees, in the form of commission pay. " 'Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." (§ 200, subd. (a).) "Wages of workers in California have long been accorded a special status generally beyond the reach of claims by creditors including those of an employer. This public policy has been expressed in the numerous statutes regulating the payment, assignment, exemption and priority of wages." (*Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 325 (*Kerr's Catering*).) "Because

10

the laws authorizing the regulation of wages, hours, and working conditions are remedial in nature, courts construe these provisions liberally, with an eye to promoting the worker protections they were intended to provide." (*Prachasaisoradej v. Ralphs Grocery Co., Inc.* (2007) 42 Cal.4th 217, 227 (*Prachasaisoradej*).)

In general, California law prohibits an employer from taking deductions from earned wages: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." (§ 221.) This statute, in combination with other related statutes, "establish[es] a public policy against *any* deductions, setoffs, or recoupments by an employer from employee wages or earnings, except those deductions specifically authorized by statute." (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 241.)

Drawing on common definitions, our Supreme Court has explained that an employer "takes a 'deduction' or 'contribution' from an employee's 'wages' or 'earnings' when it subtracts, withholds, sets off, or requires the employee to return, a portion of the *compensation* offered, promised, or paid as offered or promised, so that the employee, having performed the labor, actually receives or retains less than the *paid, offered, or promised compensation*, and effectively makes a forced 'contribution' of the difference." (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 228.)

"The use of the device of deductions creates the danger that the employer, because of his superior position, may defraud or coerce the employee by deducting improper amounts. . . . [I]t was the utilization of secret deductions or 'kick-backs' to make it appear that an employer paid the wage provided by a collective bargaining contract or by a statute, although in fact he paid less, that led to the enactment of . . . sections 221-223 in 1937.

11

These sections . . . 'are declarative of an underlying policy in the law which is opposed to fraud and deceit.'" (*Kerr's Catering*, *supra*, 57 Cal.2d at pp. 328-329.)

The statutes specifically authorize an employer to make deductions from earned wages where, among other circumstances, "a deduction is expressly authorized in writing by the employee to cover insurance premiums, hospital or medical dues, or other deductions not amounting to a rebate or deduction from the standard wage arrived at by collective bargaining or pursuant to wage agreement or statute." (§ 224.) But this exception is subject to various limitations intended to protect the employee from exploitation by his employer.

For example, in one early case, cited with approval in *Kerr's Catering*, *supra*, 57 Cal.2d at page 329, an employer's practice of deducting an amount from its employee's wages to cover lodging and transportation was found unlawful. (*Shalz v. Union School Dist.* (1943) 58 Cal.App.2d 599, 604-605.) The court held that an employer could enter into a written contract with its employees to make such a deduction, but the deduction "must bear some reasonable relation to the services furnished[.]" (*Id.* at p. 607.) The challenged deductions were unlawful because "the charges made were exorbitant and entirely out of proportion to the services rendered and were used as a device to reduce the wage scale." (*Id.* at p. 605.)

*Kerr's Catering* highlights another important limitation, that an employee cannot be made the insurer of an employer's business losses. (*Kerr's Catering*, *supra*, 57 Cal.2d at p. 328.) In *Kerr's Catering*, the employees earned a specified commission on sales over a certain minimum, but the employer deducted "the amount of any 'cash shortage' attributable" to the employee. (*Id.* at p. 322.) "[T]he parties stipulated that the deductions

12

from the wages of plaintiff's employees are taken for shortages 'not caused by a dishonest or wilful act or by the culpable negligence of the employee.' Deductions may be made, therefore, for losses beyond the employees' control, as well as for losses due to simple negligence.  The employees, through this device, are in effect made insurers of the employer's merchandise, and the commissions earned by the employees which are subject to the deduction serve the same purpose as an employee's 'bond' exacted by the employer to cover shortages." (*Id.* at p. 327.)  The Supreme Court explained that the deductions "appear to be in contravention of the spirit, if not the letter, of the Employee's Bond Law," which strictly limits the circumstances in which an employer may demand a bond from an employee to cover its losses.  (*Id.* at p. 328; see § 400 et seq.)[3]

Following *Kerr's Catering*, a number of courts have disapproved of compensation programs that shifted the risk of an employer's general business losses to its employees.  In *Quillian v. Lion Oil Co.* (1979) 96 Cal.App.3d 156, 158 (*Quillian*), an employer paid its gas station managers a base salary and a monthly bonus.  The bonus was calculated in two steps: first, a " 'tentative amount of bonus' " was computed based on a percentage of the station's sales; and second, the employer " 'deducted any cash or merchandise stock shortage occurring during the period[.]' " (*Id.* at p. 159.)

_____

[3]     The precise dispute in *Kerr's Catering* involved the Industrial Welfare Commission's power to promulgate and enforce a regulation prohibiting an employer from " 'mak[ing] any deduction from the wage of an employee for any cash shortage, breakage, or loss of equipment, notwithstanding any contract or arrangement to the contrary, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or wilful act, or by the culpable negligence of the employee.' " (*Kerr's Catering*, *supra*, 57 Cal.2d at p. 322.)  The Supreme Court held that the Industrial Welfare Commission had such power.  (*Id.* at p. 330.)  The regulation remains in force.  (See Cal. Code Regs., tit. 8, § 11070 (Regulation 11070).)

The court found this program indistinguishable from *Kerr's Catering* and concluded "that the bonus herein is in contravention of the public policy expressed in [the statutes] pertaining to cash bonds that may be required of employees." (*Id*. at p. 163.) The court rejected the employer's argument that its program was not unlawful because the deduction occurred as part of the employer's calculation of the bonus, rather than afterward. (*Ibid*.) The court explained, "It appears to this court that this is merely a clever method of circumventing the statutory definition of wages. The bonus herein described is, in fact, a scheduled payment based on the number of gallons of motor fuel sold plus a [one] percent commission on other sales. Rather than call this incentive payment a commission and then deduct for shortages in contravention to *Kerr*, appellant deducts shortages from the payment and calls the final result a bonus. Appellant then self-righteously proclaims that no deductions were made from the bonus. Unfortunately, the result is the same. The manager carries the burden of losses from the station." (*Ibid*.)

Similarly, the court in *Hudgins v. Neiman Marcus Group, Inc*. (1995) 34 Cal.App.4th 1109, 1111-1112 (*Hudgins*), found unlawful a compensation program for retail sales employees that deducted a pro rata share of " 'unidentified returns' " from the employees' commissions. The program calculated the employees' commissions "by multiplying the sales associate's net sales by a predetermined commission percentage, which varied depending on the type of merchandise sold. Net sales equaled gross sales less returns, taxes, gift wrap and alterations. 'Returns' consisted of all merchandise originally sold by the sales associate and returned during the pay period with adequate documentation to ascertain the identity of the original sales associate. Once the sales associate's net sales were multiplied by the predetermined percentage for the items sold, the total commission income

14

was known." (*Id.* at p. 1113.) The employer then made the challenged deduction, subtracting from the employee's commission income "a prorated share of the commissions deemed to have been paid on unidentified returns received in the sales associate's home base during the pay period[.]" (*Ibid.*)

Unidentified returns were defined as returns "for which the original sales associate could not be determined." (*Hudgins*, *supra*, 34 Cal.App.4th at p. 1113.) The causes of such unidentified returns included employee abuse, such as concealing the identity of the original selling associate, and customer neglect or abuse tolerated by the employer, such as returns without the proper documentation or the "return" of stolen merchandise. (*Id.* at p. 1123 & fn. 11.)

*Hudgins* held that the employer's compensation program unlawfully made the employee the insurer of the employer's business losses, as in *Kerr's Catering* and *Quillian*. (*Hudgins*, *supra*, 34 Cal.App.4th at p. 1123.) "By its terms, the unidentified returns policy calls for deductions from earned commission wages of all sales associates a sum of money representing what would otherwise be business losses occasioned by the misconduct or negligence of some of its employees and customers. The deduction is unpredictable, and is taken without regard to whether the losses were due to factors beyond the employee's control. [The employer] cannot avoid a finding that its unidentified returns policy is unlawful simply by asserting that the deduction is just a step in its calculation of commission income." (*Id.* at pp. 1123-1124.)

Our Supreme Court examined these authorities in *Prachasaisoradej*, *supra*, 42 Cal.4th 217. At issue in *Prachasaisoradej* was "a written incentive compensation plan (ICP or Plan) whereby certain employees of each [Ralphs grocery] store were eligible to receive, over and above their regular wages,

15

supplementary sums based upon how the store's actual Plan-defined profits, if any, for specified periods compared with preset profitability targets. For both target and actual purposes, profits were determined by subtracting store operating expenses from store revenues." (*Id.* at p. 222.)

"Employees' expectations with respect to these supplementary payments—i.e., what Ralphs offered or promised to pay—derived exclusively from the terms of the Plan itself." (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 229.) "By the Plan's terms, it was *only after* the store had completed the relevant period of operation, and the resulting profit or loss figure was then derived, that it was possible to determine, by a further comparison to the preset targets, whether Plan participants were entitled to a supplementary incentive compensation payment, and if so, how much. This final figure, and this figure only, once calculated, was the amount offered or promised as compensation for labor performed by eligible employees, and *it thus represented their supplemental 'wages' or 'earnings.'*" (*Ibid.*)

The plaintiff conceded that Ralphs properly calculated and paid the amounts due under the plan, and it did not withhold or deduct "any unauthorized amount from any employee's supplementary incentive compensation as finally computed and paid under the Plan." (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 229.) Instead, the plaintiff contended that Ralphs violated the law "because, by subtracting workers' compensation costs, and damage or loss expenses beyond individual employees' control, from the store's revenues to determine the profit figure on which supplementary incentive compensation payments were calculated, the Plan reduced, to that extent, the 'wages' or 'earnings' otherwise due. Accordingly, plaintiff asserts, Ralphs effectively shifted to employees, by

16

virtue of deductions from their expected wages, costs the law requires the employer to bear on its own." (*Id.* at p. 230.)

The Supreme Court disagreed. (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 230.) After reviewing *Kerr's Catering*, *Quillian*, and *Hudgins*, the court held that "the Plan does not resemble in letter or spirit, the prohibited deduction, setoff, or recapture of expected wages for the purpose of saddling employees with prohibited employer costs, as was at issue in [those cases]." (*Id.* at p. 236.) The court explained, "In each of those cases, the employee's compensation, whether regular or supplementary, was set, in essence, as a sales commission, i.e., a specified and promised share of the revenues attributable to that employee's personal sales or managerial efforts. The set commission was then directly reduced by the full dollar value of merchandise and cash losses, as determined by the employer, and regardless of employee fault. The employer thus defrayed its merchandise and cash losses by charging them, dollar for dollar, against its liability for wages. Without following the rules for cash bonds, the employer assessed individual employees the entire unliquidated value of such losses, and did so by withholding amounts from earned and promised commissions until those commissions fell to zero. By this means, the employer reduced individual employees' wages to increase its own retained profits. This is the practice the statutes, regulations, and cases have prohibited." (*Ibid.*)

By contrast, the incentive compensation plan offered by Ralphs promised nothing other than a percentage of each store's profits. (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 236.) "Amounts calculated as a percentage of the store's Plan-defined profit were the only 'wages' or 'earnings' offered or promised to eligible employees under the Plan. Ralphs took no unauthorized deductions or contributions, direct or indirect, from the

17

wages so offered or promised. If there was uncertainty in the amount ultimately due, it arose, not from employer charge-backs taken *after* the basic Plan wage was determined, but inherently from the basis on which Plan compensation was awarded." (*Id.* at p. 237.)

The Supreme Court rejected the plaintiff's suggestion that *Quillian* and *Hudgins* required a finding that the plan was unlawful. (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 238, fn. 11.) The court explained, "In those cases, employees were promised commissions set by a specific formula on the basis of *sales volume or revenues* generated by their own individual efforts. Cash and merchandise losses were then assessed against the employees to reduce these expected wages. The order in which calculations were performed to achieve that prohibited result was irrelevant. ICP's such as Ralphs's start from the fundamentally different premise that the *basic* measure of the compensation due is the *overall* profitability of the enterprise. By its inherent nature, such a plan does not promise, or even create, incentive compensation unless and until profitability occurs and is determined." (*Ibid.*) The court further distinguished the situation "whereby the employer promised the employee compensation of '$15 per hour less $3 per hour for each workers' compensation claim filed by the employee.' [Citation.] What is promised in that case is a $15 per hour wage. *Kerr's Catering*, *Quillian*, and *Hudgins* indicate that the employer cannot then take a prohibited *deduction from the promised wage*, even if it announces in advance that it will do so." (*Ibid.*)

The Supreme Court noted that "it is difficult to see how plaintiff's basic premise would not entirely eliminate net earnings or profits as a legal basis for calculating supplementary incentive compensation." (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 240.) Although "plaintiff's complaint and arguments

18

focus on particular categories of employer expenses, such as workers' compensation costs (citing section 3751) and cash shortages and merchandise losses (citing *Kerr's Catering*, *Quillian*, *Hudgins*, and Regulation 11070)," the statutes "establish a public policy against *any* deductions, setoffs, or recoupments by an employer from employee wages or earnings, except those deductions specifically authorized by statute." (*Prachasaisoradej*, at pp. 240-241.) Thus, under the plaintiff's theory, an employer would not be allowed to make *any* expense deductions for purposes of calculating the basis for a profit-based compensation plan. (*Id.* at p. 241.) Plaintiff's theory was therefore unpersuasive. (*Id.* at pp. 241-242.)

Three justices dissented from the majority's conclusion. The dissenting opinion focused on the inclusion of workers' compensation costs in the plan's profit calculations, which it found expressly prohibited by section 3751. (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 245 (dis. opn. of Werdegar, J.); see § 3751 ["No employer shall exact or receive from any employee any contribution, or make or take any deduction from the earnings of any employee, either directly or indirectly, to cover the whole or any part of the cost of compensation under this division."].) The dissent noted that the same argument could potentially be made based on the inclusion of costs for cash and merchandise shortages, but it was unnecessary to explore that issue further to resolve the appeal. (*Prachasaisoradej*, at p. 248, fn. 4 (dis. opn. of Werdegar, J.).) The dissent did not consider deductions more broadly, except to observe that "employers can still adopt incentive plans tied to a company's sales and revenue. They simply cannot also tie the plan to workers' compensation costs." (*Id.* at p. 252.)

19

*MWS's Commission Pay*

As noted, MWS pays commissions based on its sales employees' weekly net sales, i.e., their gross sales minus returns, exchanges, and price reductions, among other things. Its "Understanding Commission" publication explains, "The calculation and payment of Commission Pay are not made on the basis of [the employee's] sales of individual items of merchandise. Rather commission pay is based on your Commission Sales Productivity, or overall Net Sales of commission-eligible merchandise, for a particular work week."

As an initial matter, we conclude MWS's compensation program does not take deductions or contributions from its sales employees' earned wages. "[A]n employee's 'wages' or 'earnings' are the amount the employer *has offered or promised to pay,* or *has paid pursuant to such an offer or promise*, as compensation for that employee's labor. The employer takes a 'deduction' or 'contribution' from an employee's 'wages' or 'earnings' when it subtracts, withholds, sets off, or requires the employee to return, a portion of the *compensation* offered, promised, or paid as offered or promised, so that the employee, having performed the labor, actually receives or retains less than the *paid, offered, or promised compensation*, and effectively makes a forced 'contribution' of the difference." (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 228.)

Absent some other illegality, the compensation offered or promised to a commission-based employee is governed by the contract between the employer and the employee. "The compensation owed employees is a matter determined primarily by contract." (*Oman v. Delta Air Lines, Inc.* (2020) 9 Cal.5th 762, 781.) "The right of a salesperson or any other person to a commission depends on the terms of the contract for compensation." (*Koehl v.*

20

*Verio, Inc.* (2006) 142 Cal.App.4th 1313, 1330 (*Koehl*).) "[C]ases have long recognized, and enforced, commission plans agreed to between employer and employee, applying fundamental contract principles to determine whether a salesperson has, or has not, earned a commission." (*Id.* at p. 1331.)

Thus, as in *Prachasaisoradej*, the commissions that MWS sales employees expected to receive, i.e., what MWS offered or promised to pay, are "derived exclusively from the terms of the [compensation program] itself." (*Prachasaisoradej, supra*, 42 Cal.4th at p. 229.) The terms of MWS's compensation program are described in its "Understanding Commission" publication. In that publication, MWS offered or promised to pay a commission based on net sales, i.e., gross sales minus even exchanges and price reductions, among other things. This commission pay constitutes the wage MWS promised to pay and employees expected to receive based on their sales. "This final figure, and this figure only, once calculated, was the amount offered or promised as compensation for labor performed by eligible employees, and *it thus represented their supplemental 'wages' or 'earnings.'*" (*Ibid.*)

MWS did not deduct or take back any amount from the wage it promised to pay its sales employees. As one federal appellate court explained, in a similar context, "Because [the employer's] accounting for negative growth was not a deduction from earned commissions, but rather the contracted-to means of calculating commissions in the first place, [the employer] did not violate [section 221]." (*Cohan v. Medline Industries, Inc.* (7th Cir. 2016) 843 F.3d 660, 667 (*Cohan*).) MWS's treatment of even exchanges and price adjustments do not constitute deductions under section 221 because they do not take back any wages earned by MWS's sales employees. They are factors used to determine those wages.

21

Tessitore attempts to distinguish *Prachasaisoradej* on the ground that its compensation plan was based on the collective effort of Ralphs store employees, not their individual efforts, but the Supreme Court's discussion applies broadly to earned wages in this context as well. (See *Prachasaisoradej*, *supra*, 42 Cal.4th at pp. 229, 237.) Moreover, as in *Prachasaisoradej*, MWS's commission pay was explicitly incentive-based, and it was paid in addition to the standard hourly wages earned by MWS sales employees. (See *id.* at p. 242.)

Tessitore relies on two unpublished federal district court orders. (See *Nguyen v. Wells Fargo Bank, N.A.* (N.D.Cal., Sept. 26, 2016, No. 15-cv-05239-JCS) 2016 WL 5390245; *Mouchati v. Bonnie Plants, Inc.* (C.D.Cal., Feb. 5, 2015, No. EDCV 14-00037-VAP (SPx)) 2015 WL 12681309.) But they came to similar conclusions as we do here. In *Nguyen*, the court found that an employer's subtraction of various expenditures in calculating the commission due an employee was *not* a deduction of earned wages under section 221. (*Nguyen*, at *16.) In *Mouchati*, the court found that an employer's subtraction of labor costs in calculating a manager's commission could potentially be a deduction *only* if it affected the manager's non-commission base wage. (*Mouchati*, at *7.) Other unpublished federal district court orders have likewise followed *Prachasaisoradej* and found that subtractions applied in the calculation of commissions do not violate section 221. (See *Torres v. Wells Fargo Bank, N.A.* (C.D.Cal., Oct. 12. 2016, No. EDCV 15-2225 PSG (KKx)) 2016 WL 7373856, at *4; see also *Smith v. Golden State Warriors, LLC* (N.D.Cal., May 26, 2020, No. 18-cv-06794-SI) 2020 WL 2733978, at *6-7.) One court expressly found that reducing a retail employee's commissionable net sales based on customer returns did not violate section 221 because the employer "is not taking back a wage for

22

purposes of [section] 221; rather, [the employer] is simply not paying a commission that has not been earned." (*Rahmani v. Neiman Marcus Group, Inc.* (N.D.Cal., Sept. 30, 2006, No. C-04-3313 VRW) 2006 WL 8459733, at *11.) Tessitore's contention that MWS's treatment of even exchanges and price adjustments constitute deductions under section 221, and thus are allegedly per se unlawful, is therefore unpersuasive.[4]

This conclusion does not end our inquiry, however. Tessitore correctly points out that an employer cannot impose an unlawful deduction under the guise of a calculation or formula, even if it announces the calculation or formula in advance and an employee agrees to it. (*Hudgins, supra,* 34 Cal.App.4th at p. 1124; *Quillian, supra,* 96 Cal.App.3d at p. 163; see *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 619; *Prachasaisoradej, supra,* 42 Cal.4th at p. 237.) The issue therefore is whether MWS's treatment of even exchanges and price reductions is unlawful.

As to even exchanges, Tessitore contends MWS's policy is unlawful because it violates California's procuring cause doctrine. We disagree. The procuring cause doctrine is dependent on the underlying contract governing a sales employee's commissions. "It is established that *if the agency contract*

_____

[4]     In this context, we note that Tessitore has not challenged other, arguably analogous aspects of MWS's net sales calculation, such as its treatment of uneven exchanges and outright returns. Tessitore's position, that reductions in commission pay based on MWS's calculation of net sales constitute deductions under section 221, would appear to apply to uneven exchanges and outright returns as well. But courts have found that outright returns, at least, constitute a valid basis for reducing commission pay. (See *Hudgins, supra,* 34 Cal.App.4th at pp. 1113, 1122; see also *Prachasaisoradej, supra,* 42 Cal.4th at p. 240 [citing *Hudgins*]; *Koehl, supra,* 142 Cal.App.4th at p. 1336 [same].) As one court stated, albeit in circumstances where extensive analysis was unnecessary, "California law . . . permits [a] policy of paying commissions based on net sales." (*Nordstrom Commission Cases* (2010) 186 Cal.App.4th 576, 587 (*Nordstrom*).)

23

*contemplates payment of commissions for sales of which the agent was the procuring cause*, the agent is entitled to commissions on all sales procured by him although the sales are actually consummated by the principal after the termination of the agency." (*Wise v. Reeve Electronics, Inc.* (1960) 183 Cal.App.2d 4, 12, italics added.) MWS's compensation program does not award commission pay based on a sales employee's status as the procuring cause of any individual sale. Commission pay is determined by an employee's net sales in a given week. Where, as here, the compensation program does not incorporate the procuring cause principle, and affirmatively contradicts it, the procuring cause doctrine is not applicable. (See *Zinn v. Ex-Cell-O Corp.* (1944) 24 Cal.2d 290, 296 [procuring cause doctrine dependent on contract]; *Wise*, at p. 12 [same]; *Schuman v. IKON Office Solutions, Inc.* (9th Cir. 2007) 232 Fed.Appx. 659, 662 [same].)

Moreover, even if the procuring cause doctrine were relevant, the undisputed facts show that the original sales associate is not the procuring cause of the sale made in the even exchange. An even exchange does not reflect a consummated sale by the original associate, but rather an ultimately unconsummated one. The customer found the merchandise unacceptable and sought to return it because, for example, it was the wrong size or color. The sale made by the original associate was undone, and the second employee sold a different item to the customer as a result of the transaction. Tessitore's claim that the original employee "made the sale" and the second employee "merely makes the exchange" ignores the reality that the customer no longer wanted the merchandise he or she purchased in the initial sale and returned that merchandise to the store. The original sales associate is not the procuring cause of the later sale, of a different item, in a transaction in which the original sales associate had no involvement.

Tessitore's claim likewise assumes that the customer always wanted to make an even exchange, rather than return the item outright. But there is no basis for such an assumption. Indeed, it is logical for MWS to structure its compensation program based on the opposite assumption, to incentivize the original sales associate to avoid later exchanges and to incentivize the second sales associate to convert outright returns into even exchanges. In his deposition testimony, Tessitore agreed that a return is a selling opportunity, and he should get credit if he converts the return into an even exchange because he spent time with the customer making the sale. The original sales associate is not the procuring cause of the sale that resulted from the even exchange.

As to price adjustments, Tessitore contends MWS's policy is unlawful because it makes the employee the insurer of MWS's business losses, i.e., the cost of reimbursing the customer for the difference in price between the initial purchase price and the sale price. Tessitore is incorrect. The reduction in net sales based on price adjustments is tied directly to the employee's sales activity. It is not a general business loss incurred by MWS. In economic terms, it is analogous to a policy of recovering the commissions paid on returned merchandise, which courts have approved even if it effectively subsidizes an employer's decision to allow such returns. (See *Cohan*, *supra*, 843 F.3d at pp. 669-670; see also *Prachasaisoradej*, *supra*, 42 Cal.4th at p. 240; *Koehl*, *supra*, 142 Cal.App.4th at p. 1336; *Hudgins*, *supra*, 34 Cal.App.4th at pp. 1113, 1122.) "California law . . . permits [a] policy of paying commissions based on net sales." (*Nordstrom*, *supra*, 186 Cal.App.4th at p. 587.)

Tessitore relies on *Kerr's Catering*, *Quillian*, and *Hudgins*, but they are distinguishable. In *Kerr's Catering* and *Quillian*, the employer deducted the

full amount of the cash or merchandise shortage from the commissions due the employee. (*Kerr's Catering, supra,* 57 Cal.2d at p. 322; *Quillian, supra,* 96 Cal.App.3d at p. 159.) The employee was therefore truly the insurer of these losses, having made the employer whole. In *Hudgins,* the employer deducted the full amount of the commissions deemed to have been paid on unidentified returns from the commissions of the employees in that department. (*Hudgins, supra,* 34 Cal.App.4th at p. 1113.) Again, the employees were the insurers of these losses, having made the employer whole. Here, MWS does not recover the full amount refunded to the customer; it effectively recovers only the amount of the commission paid on the price difference. MWS still loses money on the price adjustment transaction. It does not implicate the same policy against employee bonds cited in *Kerr's Catering, Quillian,* and *Hudgins.* Nor does Tessitore argue that it violates Regulation 11070.

In addition, the undisputed facts show that MWS's practice of placing merchandise on sale benefits its commission-based employees by drawing in customers and encouraging purchases. And those employees benefit from the price adjustment policy itself because customers have protection if the merchandise they purchase later goes on sale, encouraging sales and preventing future returns. Tessitore testified that he uses the price adjustment policy as a "selling tool" to induce the customer to make a purchase from him. MWS's compensation program, which effectively shares the cost of the policy with sales employees, who also benefit, does not resemble a prohibited employee bond, which does not benefit employees at all. (See *Prachasaisoradej, supra,* 42 Cal.4th at p. 240.)

Tessitore also argues that the price adjustment policy is unlawful because it leads to variability and unpredictability in an employee's wages.

(See *Kerr's Catering*, *supra*, 57 Cal.2d at p. 329 ["To subject [an employee's] compensation to unanticipated or undetermined deductions is to impose a special hardship on the employee."].)  We note that MWS's sales employees earn a regular hourly wage, regardless of their commission pay.  And the record does not reflect any significant variability or unpredictability in an employee's commission pay based on the price adjustment policy.

In any event, some uncertainty as a result of the price adjustment policy does not render MWS's compensation plan unlawful.  As our Supreme Court has explained, "[T]his uncertainty alone cannot cause the plan to violate the wage-protection policies of the Labor Code and Regulation 11070. To hold otherwise would make every kind of achievement-based supplementary incentive compensation system, whether based on individual or overall business performance, illegal.  [¶]  The wage-protection statutes and rules do not demand that employee compensation be absolutely certain or stable from pay period to pay period, regardless of the employees' contrary understanding.  Nor do they forbid a system in which, even though services have already been performed, the final amount of wages cannot be determined until after specified contingencies have come to pass." (*Prachasaisoradej*, *supra*, 42 Cal.4th at p. 239.)

In sum, because MWS offered or promised to pay commissions based on net sales, and did in fact pay such commissions, MWS did not deduct or take back any earned wages from its sales employees.  Moreover, MWS's net sales calculation was not mere subterfuge designed to impose otherwise-unlawful deductions.  Its even exchange policy does not violate California's procuring cause doctrine, and its price adjustment policy does not make MWS's sales employees the insurers of its general business losses.  Unlike *Kerr's Catering*, *Quillian*, and *Hudgins*, there is no effort by MWS to unfairly impose on its

27

sales employees the costs of doing business. MWS's compensation program is transparent and reasonable. It does not impose "secret deductions or 'kick-backs' to make it appear that an employer paid the wage provided by a collective bargaining contract or by a statute, although in fact he paid less[.]" (*Kerr's Catering*, *supra*, 57 Cal.2d at p. 328.) Nor is it a device to defraud or coerce MWS's employees into accepting less than their promised wages. (*Id.* at pp. 328-329.) It is not unlawful under section 221.

Because MWS did not take any unlawful deductions under section 221, it also did not violate section 223's prohibition on secretly paying a lower wage than required by contract. Indeed, even if it had done so, "that error would not amount to 'secretly pay[ing] a lower wage while purporting to pay the wage designated by statute' ([] § 223), because there was nothing hidden or deceptive about defendants' payment practice." (*Stoetzl v. Department of Human Resources* (2019) 7 Cal.5th 718, 752.) For the same reasons, MWS has not violated sections 201, 202, or 203, which require an employer to pay earned wages in full when an employee resigns or is discharged. (See *Steinhebel*, *supra*, 126 Cal.App.4th at pp. 711-712.) The trial court did

not err by granting MWS's motion for summary judgment and denying Tessitore's motion.[5]

---

[5] Tessitore spends a large portion of his briefing attacking the reasoning of the trial court in its summary judgment order, particularly its reliance on a line of cases considering commission *advances*. (See, e.g., *Steinhebel, supra,* 126 Cal.App.4th at p. 704.) But, as noted, we are not bound by the trial court's reasoning and need not consider whether it was correct. (*Coral Construction, supra,* 50 Cal.4th at p. 336; *Canales, supra,* 23 Cal.App.5th at p. 1268.) We agree with Tessitore that MWS does not pay advances on commission. Its commission pay is earned when paid. This circumstance is not dispositive for reasons we have already discussed. The fact that other courts have approved various methods for charging back advance commissions does not mean that MWS's method for calculating earned commissions based on net sales (and not charging back previously-paid commissions) is unlawful. In light of our conclusion, we need not consider the extent to which an employee may authorize deductions from earned wages under section 224. (Compare *Koehl, supra,* 142 Cal.App.4th at pp. 1337-1338 with *City of Oakland v. Hassey* (2008) 163 Cal.App.4th 1477, 1500-1501.) We also need not consider the parties' contentions regarding judicial estoppel based on prior litigation against MWS.

## DISPOSITION

The judgment is affirmed.  MWS is entitled to its costs on appeal.


GUERRERO, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.